COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS



BRAZOS ELECTRIC POWER       §
COOPERATIVE, INC.,                           No. 08-16-00069-CV

                                  §

           Appellant,                     Appeal from the

                                  §

v.                                       98th District Court

                                  §

TEXAS COMMISSION ON                    of Travis County, Texas
ENVIRONMENTAL QUALITY and    §
RICHARD A. HYDE, Executive Director           (TC# D-1-GN-14-004531)
of TCEQ,                               §

           Appellees.                      §

## **O P I N I O N**

The Brazos Electric Power Cooperative (Brazos Electric) and the Texas Commission on Environmental Quality (TCEQ) do not agree on much in this administrative tax appeal, but when it comes to the science underlying this dispute, both parties mostly sing from the same hymnal.

In a "single-cycle power plant," a generator uses a single turbine powered by a natural gas combustion engine to generate electricity. The engine gives off heat and the pollutant precursor gas nitrogen oxide (NOx), both of which are vented off into the atmosphere through piping known as a spooling device. By placing a heat steam recovery generator (HRSG) where the spooling device used to be, Brazos Electric can turn its single-cycle power plants into "combined-cycle" power plants that use wasted heat from the gas engine to boil water, create steam, and pass the

steam through the blades of a second, steam-powered turbine. A combined-cycle power plant with a HRSG still vents NOx into the atmosphere, but the HRSG lets a plant use a given amount of fossil fuel to effectively power two engines instead of just one, thereby generating more electricity.

The issue in this case is whether by purchasing and using HRSGs at its two power plants, Brazos Electric is entitled to an ad valorem tax break reserved for devices that are installed to comply with state and federal regulations aimed at abating air pollution. See TEX.TAX CODE ANN. §§ 11.31(a)-(b)(West 2015).

Section 11.31 requires TCEQ's Executive Director to determine whether a device is being used "wholly or partly" for regulatory compliance purposes before granting a tax break. *Id*. Where a dual-use device has a pollution control function, but the device also makes a facility more productive and more profitable, the Executive Director is limited to granting a tax break that is proportionate with the device's pollution abatement value. *See* TEX.TAX CODE ANN. § 11.31(g)(3)(West 2015). To make this relative function determination, TCEQ uses an algebraic formula known as the cost analysis procedure (CAP) that balances any increased marginal capital costs associated with upgrading from "dirty" technology to "green" technology against any positive potential return on investment, applying a tax rate accordingly. *See generally* 30 TEX.ADMIN.CODE § 17.17 (2017)(Tex. Comm'n on Envtl. Quality, Partial Determinations)

TCEQ's administrative rules allow for the CAP formula to result in a zero or negative value. When that happens, TCEQ denies the tax break. 30 TEX.ADMIN CODE § 17.17(d). TCEQ reasons that the Legislature intended for the Section 11.31 tax break to be used only to coax businesses into complying with environmental regulations when compliance would otherwise be "economically irrational" and cost-prohibitive. But if an applicant either saves money on the front end by adopting cheaper green technology over "dirty" technology, or if on the back end

2

more expensive green technology ultimately pays for itself in the long run by increasing profits, TCEQ believes regulatory compliance would be economically rational, rendering Section 11.31 tax break unnecessary and unavailable.

That brings us to the second point on which Brazos Electric and TCEQ agree. For purposes of this appeal, both parties concede that the CAP formula is the only proper decisional framework to apply, at least in theory. But in its primary appellate issue, Brazos Electric maintains that even if the CAP formula results in a zero or negative number in a HRSG application, TCEQ cannot by statute deny HRSGs a tax break, since HRSGs appear on a preordained list of properties at TEX.TAX CODE ANN. § 11.31(k)(West 2015)(referred to by the parties as "the k-list") that are mandatorily entitled to receive some kind of tax break under TEX.TAX CODE ANN. § 11.31(m).

We disagree with Brazos Electric's reading of Subsection (m), and instead agree with TCEQ's position that Subsection (m) does not require the agency to issue a tax break to k-list properties. Rather, Subsection (m) only requires TCEQ to give k-list applicants certain administrative preferences during TCEQ's decisional process; the agency still retains the discretion to decide whether and on what terms a k-list applicant receives a tax break. We also disagree with Brazos Electric's other two alternative appellate contentions: namely, that TCEQ has engaged in informal rulemaking in violation of the Administrative Procedure Act's formality requirement; and that no reasonable person could reject the three alternative proposed CAP formulations Brazos Electric submitted in its tax applications to TCEQ.

For the following reasons, we will affirm the judgment of the trial court.

## BACKGROUND

### *The Administrative Framework*

Beginning in 1994, the Texas Constitution permitted the Legislature to pass laws

3

exempting from taxation "all or part of real and personal property used, constructed, acquired, or installed wholly or partly to meet" state and federal environmental regulations aimed at "the prevention, monitoring, control, or reduction of air, water, or land pollution." TEX.CONST. art.VIII, § 1-*l* (a)-(b). Relying on that grant of authority, the 73rd Legislature passed a law granting a person an "exemption from taxation of all or part of real and personal property that the person owns and that is used wholly or partly as a facility, device, or method for the control of air, water, or land pollution." *See* TEX.TAX CODE ANN. § 11.31(a). A facility, device, or method for controlling air pollution is defined as "any . . . equipment[] or device . . . that is used, constructed, acquired, or installed wholly or partly to meet or exceed rules or regulations adopted by any environmental protection agency . . . for the prevention, monitoring, control, or reduction of air . . . pollution." TEX.TAX CODE ANN. § 11.31(b).

To qualify for this tax break, an applicant must submit an application detailing three factors:

(1) The anticipated environmental benefits from the installation of the facility, device, or method for the control of air, water, or land pollution;

(2) The estimated cost of the pollution control facility, device, or method; and

(3) The purpose of the installation of such facility, device, or method, and the proportion of the installation that is pollution control property.

TEX.TAX CODE ANN. § 11.31(c). "If the installation includes property that is not used wholly for the control of air . . . pollution, the person seeking the exemption shall also present such financial or other data as the executive director [of TCEQ] requires by rule for the determination of the proportion of the installation that is pollution control property." *Id*.

The Texas Legislature vested TCEQ's Executive Director with the power to administer this tax break, *see* TEX.TAX CODE ANN. § 11.31(d), and created a two-step process for seeking a

4

tax exemption. First, the exemption-seeker must file an application for a use "determination" with the Executive Director, who decides whether certain property qualifies wholly or partially as pollution-control property. TEX.TAX CODE ANN. §§ 11.31(c), (d). If the property is only partially used for pollution control, the Executive Director can only grant an exemption that is proportional to that property's use for pollution control. TEX.TAX CODE ANN. §§ 11.31(c), (g)(3). Once the Executive Director has rendered his or her decision, the applicant may take the decision to its local appraisal district and obtain tax relief. TEX.TAX CODE ANN. § 11.31(d). However, if the applicant or the appraisal district is unhappy with the Executive Director's decision, either party may appeal to the TCEQ commissioners. TEX.TAX CODE ANN. § 11.31(e); 30 TEX.ADMIN.CODE § 17.25 (2017)(Tex. Comm'n on Envtl. Quality, Appeals Process). The appeal hearing is uncontested for purposes of the Administrative Procedures Act. *Id*. At this second step of the process, the TCEQ commissioners, sitting at a regularly scheduled meeting, may either affirm the Executive Director's decision or else remand to the Executive Director for a redetermination. *Id*. From there, an aggrieved party may seek judicial review of the agency determination in district court. TEX.WATER CODE ANN. § 5.351(a)(West 2008).

### *TCEQ's Cost-Analysis Procedure and the "k-List"*

The adjudicative process TCEQ has for Section 11.31 tax breaks has changed throughout the years. We discuss the previous processes leading up to Brazos Electric's applications fully in order to provide context about how for years now TCEQ and stakeholders have struggled with determining tax breaks for HRSGs.

Initially, in determining whether and to what extent property qualified for a tax break, the TCEQ processed exemption applications using a three-tiered process:

- **Tier I**—reserved for equipment identified on an internal TCEQ list that TCEQ had previously determined qualified for a 100% exemption;

5

- **Tier II**—reserved for equipment not on the TCEQ list that nevertheless qualified for a 100% exemption; and

- **Tier III**—reserved for equipment not on the TCEQ list that was partially exempt from qualification.

*See* 30 TEX.ADMIN.CODE §§ 17.2(8-10)(2017)(Tex. Comm'n on Envtl. Quality, Definitions). For Tier III applicants, TCEQ used and continues to use the CAP formula to determine an applicant's effective tax break rate. *See* 30 TEX.ADMIN.CODE § 17.17(a)(2017)(Tex. Comm'n on Envtl. Quality, Partial Determinations). At core, the CAP balances out the marginal capital costs of upgrading equipment against any potential return on investment, expressing that value as a percentage of the new technology's overall cost. The percentage is used to determine if an applicant may receive a tax break, and if so, how much.

The CAP first takes the capital cost of comparable equipment without the pollution control feature (Capital Cost Old), and then subtracts that value from the capital cost of the actual equipment at issue with the pollution control feature (Capital Cost New). 30 TEX.ADMIN.CODE § 17.17(c)(1). The difference is the marginal cost that TCEQ asserts is the capital value attributable to pollution control efforts. From there, the CAP further deducts the net value of any marketable material generated by the equipment over its lifetime; this variable is known as the "net present value of the marketable product" (NPVMP). *Id.* §§ 17.17(c)(1)-(2). Whatever amount is leftover once the NPVMP is subtracted then is divided by the capital cost of the actual equipment (Capital Cost New) to get a percentage. *Id.* If the amount is a positive percentage, that percentage is used as the percentage of the tax break. "If the cost analysis procedure . . . produces a negative number or a zero, the property is not eligible for a positive use determination." *Id.* § 17.17(d). We set out a simplified algebraic representation of the CAP formula below in Table 1.1:

6

| TCEQ's Simplified Cost Analysis Procedure Formula |
|---|
| $$\frac{(x_1 - x_2) - y}{x_1} \bullet 100 = z\%$$ |
| $x_1$ : Capital cost of the actual equipment at issue, with pollution control feature (Capital Cost New)[1] <br> $x_2$ : Capital cost of comparable equipment without pollution control feature (Capital Cost Old) <br> $y$ : Net value of any marketable material generated by equipment over lifetime (NPVMP) <br> $\bullet$ : Multiplication sign <br> $z$ : Percentage of equipment's capital cost attributable to pollution control/tax break percentage |

*Table 1.1*

While the CAP functioned well as a tool to compare old technology with new technology, both parties agree that the CAP presented a challenge for TCEQ's use determination process both for dual-use properties that served joint pollution control and production purposes, and for emergent technologies whose capital costs could not be neatly tethered to those of previously-known technical analogues.

In 2007, the Legislature amended the Tax Code by creating eighteen categories of property, technology, and equipment located in TEX.TAX CODE ANN. § 11.31(k) that both parties refer to as the "k-list." *See* Act of June 15, 2007, 80th Leg., R.S., ch. 1277, § 4, 2007 TEX.GEN.LAWS 4261,

---

[1] In the full CAP formula, the Capital Cost New variable is multiplied by a Production Capacity Factor variable, which "is used to adjust the capacity of the new equipment or process to the capacity of the existing equipment or process." 30 TEX.ADMIN.CODE 17.17(c)(1). The full CAP formula is:

$$\frac{(\text{Production Capacity Factor} \times \text{Capital Cost New}) - \text{Capital Cost Old} - \text{NPVMP}}{\text{Capital Cost New}} \times 100$$

The Production Capacity Factor has been omitted from the simplified CAP formula we use because both parties agree that variable is not at issue in this case. As such, $x_1$ represents only the Capital Cost New amount.

4264. HRSGs are among the technologies that appear on the k-list. TEX.TAX CODE ANN. § 11.31(k)(8).

Brazos Electric and TCEQ clash over what placement on the k-list actually means, and we will address that specific controversy later in the opinion. Suffice to say, in response to the new legislation, TCEQ took the position that the k-list created an expedited review process for those particularly listed technologies, but that the Legislature did not require the agency to issue *per se* positive use determinations for those technologies. *See* 33 TEX.REG. 932, 933 (2008)(codifying former 30 TEX.ADMIN.CODE 17.17(d) and (e))(Tex. Comm'n on Envtl. Quality, Background and Summary of the Factual Basis for the Adopted Rules).[2]

TCEQ created a new category of applications—Tier IV—for k-list technologies. *Id.* at 942. TCEQ also adopted a new rule allowing Tier IV applicants to propose their own ad hoc methodologies that TCEQ could use to calculate use percentages for that technology, all subject to the Executive Director's approval. *See id.* at 934 (adopting 30 TEX.ADMIN.CODE § 17.17 (d), (e)(2008)*, repealed and modified in part*, 33 TEX.REG. 10964, 10982 (2010))("The adopted amendment adds new §17.17(d) which explains that it is the responsibility of the applicant to determine a reasonable method for calculating a partial determination for all items submitted under

---

[2]TCEQ's specific administrative findings on that point read as follows:

> [Texas Tax Code] §11.31(k) requires the TCEQ to adopt a list containing the 18 categories of equipment. However, §11.31(k) does not provide the pollution control percentage for each of the 18 categories of items. Staff reviewed these items and determined that the pollution control percentage could vary depending upon the type of facility where the property is located, and the function of the property. After discussions with stakeholders, program staff developed a two-part list. . . . Part B of the list consists of the 18 property categories listed in TTC, §11.31(k). . . . The items in Part B are listed without set use determination percentages. Applicants will be required to calculate an application-specific determination for each piece of equipment. It is the responsibility of the executive director to determine the proper use percentage using the range of 0%-100%. Simply because a piece of equipment is on the Equipment and Categories List or purports to fall under a category set forth on the list, does not mean that it will receive a positive use determination. The use percentage will be calculated for each piece of property on an application-by-application basis.

8

a category or categories contained in Part B of the ECL [i.e. the k-list].").

### *TCEQ Tackles Tax Breaks for HRSGs Using Ad Hoc Tier IV Review; Appraisal Districts Revolt; Legislature Requires TCEQ to Apply Rules "Uniformly to All Applicants," Including k-List Applicants*

Following the Legislature's adoption of the k-list and TCEQ's adoption of Tier IV review for k-list properties and technologies, TCEQ received at least 35 applications for use determinations for HRSGs and the related enhanced steam turbine systems (ESTs) under Tier IV. *See* TEX. LEG. BUDGET BD., TEXAS STATE GOVERNMENT EFFECTIVENESS AND EFFICIENCY: SELECTED ISSUES AND RECOMMENDATIONS at 109, 111-12 (Jan. 2009). According to TCEQ, various applicants proposed various methods for calculating pollution control percentages. On May 1, 2008, TCEQ's Executive Director, using the ad hoc formulas proposed by the applicants themselves, approved twenty-five applications for 100 percent positive use determinations for HRSG applicants, but he made negative use-determinations for the steam turbines attached to the HRSGs.

Appraisal districts appealed positive-use determinations in six cases, arguing that the HRSGs in those specific applications were being used solely as production equipment and should not receive any tax breaks at all (the Group 1 Appeals). Efforts at obtaining a mediated settlement on proper HRSG use-determination methodology through a "workgroup" between applicants and appraisal districts failed, and TCEQ's commissioners docketed the Group 1 Appeals for February 2009. Those appeals were continued indefinitely at the Executive Director's request.

Meanwhile, in January 2009, the Legislative Budget Board, considering the Tier IV controversy, its effect on HRSG applicants, and the potential loss of millions of dollars of tax revenue as a result of inconsistent decisional methodologies,[3] recommended that the Legislature

---

[3] The Legislative Budget Board noted that "[b]ecause the first 35 applications for pollution control property tax exemptions related to HRSGs and ESTs account for equipment valued at more than $2.0 billion, TCEQ's use

[A]mend Texas Tax Code, Section 11, to require TCEQ to use the CAP formula as a maximum exemption when making a use determination for equipment listed in Texas Tax Code, Section 11.31(k). The maximum exemption granted any applicant requesting an exemption for equipment [on the k-list] . . . should not exceed the exemption that would be granted if the applicant were using the formula. The CAP formula includes variables that account for the economic benefit to the property owner of the pollution control equipment. TCEQ allows Tier IV applicants to develop their own methodology to encourage innovation in use determination. If the agency would prefer to continue to use such innovation, the statutory change should be permissive in allowing applicants to develop their own use determination methodology. However, that methodology should not exceed the maximum allowable use determination from an application of the CAP formula.

TEX.LEG.BUDGET BD., at 113-14.

After the Legislative Budget Board issued its recommendation, the Texas Legislature altered the landscape yet again in May 2009 by passing TEX.TAX CODE ANN. § 11.31(g-1). *See* Act of May 25, 2009, 81st Leg., R.S., ch. 962, § 3, 2009 TEX.GEN.LAWS 2556, 2557-58 (effective Sept. 1, 2009). That subsection states:

The standards and methods for making a determination under this section that are established in the rules adopted under Subsection (g) apply uniformly to all applications for determinations under this section, including applications relating to facilities, devices, or methods for the control of air, water, or land pollution included on a list adopted by the Texas Commission on Environmental Quality under Subsection (k).

According to its brief, TCEQ interpreted Subsection (g-1) as requiring it to abandon ad hoc Tier IV review and instead apply the CAP formula to all applications for use determinations moving forward, including those applications concerning k-list properties. In 2010, TCEQ finally codified this understanding by repealing Tier IV review and instead requiring all applicants to use the CAP formula to determine use percentages, regardless of whether the subject property appeared on the k-list or not. *See* 33 TEX.REG. 10964, 10982 (2010).

### *Brazos Electric's HRSG Exemptions are Rejected*

---

determination of 100 percent for HRSGs and 0 percent for ESTs could reduce taxable property value in the affected tax districts by as much as $1.5 billion for these applications alone." *Id*. at 113.

*The Initial Applications*

In Application #13544, Brazos Electric sought a 100 percent positive use determinations for its Johnson County facility in April 2009. In May 2009, TCEQ informed Brazos Electric that it was abating its technical review of the Johnson County application until the six Group 1 Appeals were resolved. In September 2009, TCEQ informed Brazos Electric that it was subject to the uniform-decision requirements of the newly-enacted Subsection (g-1), which would affect its application.[4] From that point, administrative activity apparently stopped until March 7, 2012, when Brazos Electric submitted a revised use determination application for its Johnson County facility. At that time, Brazos Electric also submitted Application #16413, seeking a separate use determination for the HRSG at its Jack County facility.

In its revised Johnson County application, Brazos Electric applied the CAP formula using $28,111,986 as the Capital Cost New variable, $0 as the Capital Cost Old variable, and $11,039,233.23 as the projected NPVMP production variable, which resulted in a positive use determination of +60.73%.[5] In its Jack County application, Brazos Electric used $105,244,426.00

---

[4] The session law enacting Subsection (g-1), which dictates that TCEQ apply its standards and methods of determination "uniformly" to all applicants including k-list applicants, specifies that Subsection (g-1) only applied to cases filed after January 1, 2009, that were not yet final as of the Act's enactment date of September 1, 2009. *See* Act of May 25, 2009, 81st Leg., R.S., ch. 962, § 3(a), 2009 TEX.GEN.LAWS 2556, 2557-58.

Because Brazos Electric filed its Johnson County application after January 1, 2009, and because TCEQ's decision on the Johnson County facility had not become final as of September 1, 2009, TCEQ was required to decide the Johnson County facility application in accordance with the uniform rules of decision mandate of TEX.TAX CODE ANN. § 11.31(g-1). Presumably, this is why Brazos Electric has elected to use the CAP as its lodestar on appeal and does not challenge TCEQ's rejection of the non-CAP formulations as being erroneous.

That being said, we are aware that our sister court in Austin has decided a consolidated set of appellate cases all dealing with HRSG applicants who originally applied under Tier IV review, before Subsection (g-1) was enacted. *See Freestone Power Generation, L.L.C. et al v. Tex. Comm'n on Envtl. Quality*, Nos. 03-16-00692-CV, No. 03-16-00692-CV, No. 03-16-00693-CV, No. 03-16-00694-CV, No. 03-16-00695-CV, No. 03-16-00698-CV, No. 03-16-00699-CV, No. 03-16-00700-CV, and No. 03-16-00701-CV, 2017 WL 3044547 (Tex.App.--Austin July 11, 2017, no pet.h.)(mem. op.). We address the effect of *Freestone* later in this opinion.

[5] Initial Johnson County CAP formulation, represented mathematically:

as the Capital Cost New variable, $0 as the Capital Cost Old variable, and $26,671,381.03 as the projected NPVMP production variable, which resulted in a positive use determination of +74.66%.[6]

The Executive Director summarily rejected both application and issued a negative use determination on July 2012, stating only: "Heat recovery steam generators and associated dedicated ancillary equipment are used solely for production; therefore, are not [sic] eligible for a positive use determination." Brazos Electric appealed to the Commissioners. On December 10, 2012, the TCEQ Commissioners reversed thirteen of the Executive Director's HRSG use determinations (including Brazos Electric's two appeals), vacated his orders, and remanded the applications to him for new use determinations.

*Proceedings on Remand to the Executive Director*

On remand, the Executive Director issued Notices of Deficiency to Brazos Electric with respect to both the Johnson and Jack County facilities, requesting more information and stating that he believed the appropriate Capital Cost Old variable that should be used was not "$0," but rather the cost of a boiler that produced the same amount of steam as a HRSG. In response, Brazos Electric objected to the use of the boiler as the Capital Cost Old variable. Brazos Electric recalculated the original CAP formulation using a slightly lower NPVMP value at the Johnson County facility, resulting in a proposed positive use determination of +64.29%.[7] The Jack County

---

$$\frac{(\$28,111,986.00 - \$0) - \$11,039,233.23}{\$28,111,986.00} \times 100 \approx 60.73\%$$

[6] Initial Jack County CAP formulation, represented mathematically:
$$\frac{(\$105,244,426.00 - \$0) - \$26,671,381.03}{\$105,244,426.00} \times 100 \approx 74.66\%$$

[7] Updated initial CAP, represented mathematically:

percentage stayed the same. "Without waiving its right to pursue" those use determinations, Brazos Electric also proposed four alternative methods for determining the tax break. Two methods did not apply the CAP formula. Brazos Electric has abandoned these options on appeal; we need not discuss them further. The other two methods applied the CAP using different variables.

In the first revised CAP formulation, Brazos Electric suggested that a spooling device worth $150,000 could be used to determine that Capital Cost Old factor, since the spooling device—essentially, piping—would fill the space between the natural gas generator and the exhaust stack if the HRSG were removed from the plant. It is undisputed that a spooling device does not produce steam and has no productive value. This proposed CAP formulation would result in a +63.76% usage score at the Johnson County facility[8] and a +74.52% usage score at the Jack County facility.[9]

In its second revised CAP formulation, Brazos Electric reiterated its position that $0 should be used as the Capital Cost Old variable because no technology comparable to a HRSG existed, and the company replaced the original $11 million NPVMP variable proposed in its initial application with a $0 NPVMP variable, resulting in a 100 percent use determination at both

$$\frac{(\$28,111,986.00 - \$0) - \$10,097,697.34}{\$28,111,986.00} \times 100 \approx 64.29\%$$

[8] Revised CAP Option #1 for Johnson County facility, represented mathematically:
$$\frac{(\$28,111,986.00 - \$150,000.00) - \$10,037,697.34}{\$28,111,986.00} \times 100 \approx 63.76\%$$

Where $150,000 is the cost of a spooling device, and $10,037,697.34 is the adjusted NPVMP. We note that the NPVMP factor in this formulation is different that the NPVMP factor used in the updated initial CAP formulation *supra*.

[9] Revised CAP Option #1 for Jack County facility, represented mathematically:
$$\frac{(\$105,244,426.00 - \$150,000.00) - \$26,671,384.03}{\$105,244,426.00} \times 100 \approx 74.52\%$$

facilities.[10]  Brazos Electric reasoned that the $0 NPVMP input was appropriate because the CAP formula required it to "imagine a world that bears little resemblance to reality" and presuppose that a HRSG that was a "stand-alone" item not connected to either a fuel input or an energy output; under those conditions, the HRSG had zero productive value.

Following a second Notice of Deficiency issued by the Executive Director and a response from Brazos Electric in which both parties respective positions remained unchanged, the Executive Director ultimately rejected all of Brazos Electric's proposed calculations, finding that the technology most similar to a HRSG was not spooling device/piping, but rather a steam boiler whose value exceeded the value of the HRSG.  In applying the cost of this boiler using the CAP, the Executive Director issued negative scores for both the the Johnson County facility HRSG (-82.55%)[11] and the Jack County facility HRSG (-277.50%).[12]  Based on these scores, the Executive Director issued a negative use determination and denied the tax break.  The Executive Director explained his reasons for rejecting Brazos Electric's proposed methodologies:

- Modified CAP Calculation (64%) [Spooling Device as CCO]: Capital Cost New (CCN) includes dedicated ancillary systems.  Allowing Capital Cost Old (CCO) to be equal a pipe [sic] or spool piece ignores that HRSGs are alternative production equipment.  CCO is the cost of comparable equipment without the

---

[10]    Revised    CAP    Option    #2    for    Jack/Johnson,    represented    mathematically:
$$\frac{(\$28,111,986.00 - \$0) - \$0}{\$28,111,986.00} \times 100 = 100\%$$

[11] Executive Director's CAP formulation for Johnson County facility, represented mathematically:
$$\frac{(\$28,111,986.00 - \$41,280,000.00) - \$10,037,697.34}{\$28,111,986.00} \times 100 \approx -82.55\%$$

Where $134.4 million represents the value of a boiler that produces the same amount of steam as a HRSG.

[12] Executive Director's CAP formulation for Jack County facility, represented mathematically:
$$\frac{(\$43,225,585.41 - \$134,400,000.00) - \$28,774,661.00}{\$43,225,585.41} \times 100 \approx -277.50\%$$

Where $134.4 million represents the value of a boiler that produces the same amount of steam as a HRSG.

14

pollution control. If the HRSGs produce steam, then comparable equipment that produces steam without pollution control is a boiler. The ED does not find it reasonable to equate CCO to a spool piece.

- Modified CAP Calculation (100%): Capital Cost New (CCN) includes dedicated ancillary systems. Allowing Capital Cost Old (CCO) to be $0 ignores that HRSGs are alternative production equipment. CCO is the cost of comparable equipment without the pollution control. If the HRSGs produce steam, then comparable equipment that produces steam without pollution control is a boiler. The ED does not find it resoanable to attribute $0 cost to CCO in the CAP.

- CAP as proposed by the executive director . . . : The CAP formula was adopted by the commission to provide a methodology for determinations that distinguishes [sic] the proportion of property that is used to control, monitor, prevent, or reduce pollution from the proportion of property that is used to produce goods or services. The fact that the CAP calculated results in a negative number shows that the HRSGs' and dedicated ancillary equipment's pollution prevention benefit is negative by its ability to produce a product.

On second appeal, the Commissioners affirmed the Executive Director's decision.

### *Proceedings in District Court*

Brazos Electric brought an action under TEX.WATER CODE ANN. § 5.351 seeking declaratory relief in Travis County district court. Following review of the administrative record and a hearing, the Travis County district court affirmed TCEQ's denial of the tax break. This appeal followed. We hear this case on transfer from our sister court, the Third Court of Appeals in Austin, by order of the Texas Supreme Court. We apply the precedent of that court and defer to that court's decisions to the extent required by the Rules of Appellate Procedure. TEX.R.APP.P. 41.3.

### DISCUSSION

### Introduction

*The Court's Limited Role in Administrative Appeals and What Questions We May Answer*

This case has many moving parts on both a macro and micro level. At the macro level, it

implicates numerous important questions about Texas' environmental policy and the tax incentives given to encourage businesses to "go green." It also implicates our fidelity to the Texan constitutional principle that taxes should be equal and uniform unless voters amend the Constitution to say otherwise, as well as our deference to the legislative balancing act of ensuring both that businesses prosper and that our schools, roads, and infrastructure are all properly funded with taxes. Although the litigants on both sides paint with broad strokes, our role to play in answering these macro-level questions is much narrower and largely limited by the micro-level action of administrative mechanisms and appellate rules. We only answer those questions which are necessary to the resolution of this appeal as between the two parties before us, and only reach those questions actually raised by these two parties. We winnow away side issues to keep our opinions clear, focused, usable, and as short as practicable. TEX.R.APP.P. 47.1. So we pause at the outset to clarify what this case is *not* about.

This case is not about whether we believe it would be good policy for Brazos Electric to get a tax break for using HRSGs at their power plants. We do not make policy; we interpret law. *In re Allen*, 366 S.W.3d 696, 708 (Tex. 2012). Deciding who should get what tax break and under what circumstances is the Legislature's job, not ours, TEX.CONST. art. VIII, §§ 1(a), 1-*l*, and administering the tax break set by the Legislature is the TCEQ Executive Director's job, not ours. TEX.TAX CODE ANN. § 11.31(d). "Where the action under review involves a matter that the legislature has committed to the agency's discretion or judgment, a court will not determine the advisability or wisdom of the agency's action but will sustain that action if it is reasonably supported by substantial evidence." 2 TEX.JUR.3D ADMINISTRATIVE LAW § 220 (2017). We are limited to determining whether TCEQ, in rendering its tax decision, acted arbitrarily and capriciously, or otherwise exceeded the statutory authority granted to it by the Legislature. *Mont*

16

*Belvieu Caverns, L.L.C. v. Tex. Comm'n on Envtl. Quality*, 382 S.W.3d 472, 489 (Tex.App.--Austin 2012, no pet.). If TCEQ acted within the reasonable bounds of its statutory authority, we have no role to play here. *Id.*

This case is also not about whether we believe the CAP formula itself is reasonable, fair, wise, outdated, or prescient, or even whether we believe it takes into account all the intangible factors that might be relevant in determining whether equipment serves a pollution-control function and whether its adoption is economically rational. Why not? Because the Rules of Appellate Procedure prohibit us from entertaining those questions here. While Brazos Electric complains about a laundry-list of bureaucratic indignities, Brazos Electric also repeatedly disavows any challenge to the reasonableness of the CAP formula on appeal.[13] The parties both agree in their briefs that the CAP formula is the yardstick we must use in deciding whether TCEQ—acting within the proper bounds of its statutory authority—can grant the tax break in this case. We are constrained to considering only those legal issues raised in the briefs. TEX.R.APP.P. 38.1(f). Brazos Electric asks us primarily to sketch out the boundaries of the statute and then decide whether the Executive Director acted permissibly within those boundaries. Any ancillary issues not fairly subsumed within the statutory construction question, including the reasonableness of the CAP formula, have not been assigned for our review, and in civil cases, we are prohibited from reaching out and reversing a judgment on the basis of unassigned error. *See Pat Baker Co., Inc. v. Wilson*, 971 S.W.2d 447, 450 (Tex. 1998).

Accepting as we must that the only measure we can employ in determining whether Brazos

---

[13] *See, e.g.,* App. Br. 39 (opining that TCEQ may be wise to change the rules in the future but asserting that "in this appeal, Brazos Electric does not challenge any of the TCEQ's formally adopted rules. . . . [T]he TCEQ's decision to instead retain and expand its use of the CAP formula is not what necessitates negative-use determinations . . . ."); Reply Br. at 25 ("The TCEQ raises several reasonableness arguments. Most of these arguments relate to the reasonableness of the CAP formula, which Brazos does not challenge. Instead, Brazos Electric challenges the TCEQ's ad hoc decision to insist on using the cost of a new boiler for the 'Capital Cost Old' variable when applying the CAP formula to HRSGs.").

17

Electric is entitled to the tax break is the CAP formula—with the caveat that TCEQ can only apply the CAP formula within the proper constraints of the enabling provisions of the Tax Code—we proceed.

*The Precise Issues Raised by Brazos Electric's Opening Brief*

Brazos Electric raises three issues on appeal. In Issue One, Brazos Electric challenges TCEQ's authority to deny the tax break at all, arguing that TEX.TAX CODE ANN. § 11.31(m) requires TCEQ to grant HRSG users some kind of tax break—though Brazos does not specify in what amount. In Issue Two, Brazos Electric contends that TCEQ violated that Administrative Procedures Act by effectively adopting an "informal practice" of denying all HRSG tax applications and refusing to allow any HRSG user to claim an exemption without undergoing the formal rulemaking process. Finally, in Issue Three, Brazos maintains if TCEQ retained discretion to decide whether the tax break applies, TCEQ arbitrarily and capriciously denied the tax break in this case by comparing a HRSG to a particular kind of boiler steam generator, the value of which exceeds a HRSG.

## I.

## Issue One: Statutory Construction

*In Light of Subsection (m), Can TCEQ Deny a Section 11.31 Tax Break to k-list Properties When the Application of the CAP Formula Results in a Zero or Negative Value?*

We begin with the statutory construction problem underpinning most of Brazos Electric's arguments. In Issue One, Brazos Electric contends that Subsection (m) withdraws from TCEQ any ability or discretion to deny HRSGs a Section 11.31 tax break. Thus, even if an objective application of the CAP formula results in a zero or a negative number—indicating that TCEQ has determined the HRSG was not, in fact, installed for a pollution-control purpose—TCEQ must still grant Brazos Electric a tax break of some kind per Subsection (m).

18

We disagree.

## A.

### *Standard of Review and Statutory Construction Standards*

The limits of TCEQ's discretionary authority under Subsection (m) implicate a question of statutory construction. We review questions of statutory construction de novo. *Mont Belvieu Caverns, L.L.C.*, 382 S.W.3d at 486. However, we are also mindful that we hear this case on transfer from the Third Court of Appeals by order of the Supreme Court of Texas. In this procedural posture, we are bound to apply the precedent of that court. *See* TEX.R.APP.P. 41.3. To the extent that the Third Court has answered an open statutory construction question relevant to this case, we cannot disregard that interpretation but must apply it, regardless of whether we personally might have decided the issue differently. *Id.*[14]

---

[14] During the pendency of this case, our sister court in Austin decided the case *Freestone Power Generation, L.L.C. v. Texas Commission on Environmental Quality*, No. 03–16–00692–CV et al., 2017 WL 3044547 (Tex.App.--Austin July 11, 2017, no pet.h.)(mem. op.). In *Freestone*, the Austin court held that TCEQ exceeded its statutory authority by denying tax breaks to HRSGs because the statute required TCEQ to issue some sort of tax break to k-list properties. *Id.* at *6-*7.

Per Rule 41.3, as the transferee court, we are bound by the transferor court's precedent, even if we would have decided the case differently working on a clean slate. This Rule has placed us in a difficult position. In truth, given that both *Freestone* and this case partially embrace the same open question of law, and that given that Austin is the ultimate decider under Rule 41.3, it may have served both our courts better if this orphan appeal had not found itself on the transfer docket in the first place. We respectfully request that the Supreme Court of Texas consider revising the transfer rule to prevent transfers in situations like this where true issues of first impression are simultaneously presented in a transferor and transferee court. It creates a serious dilemma for the transferee court: should the transferee court—often a smaller court—proceed forward allocating limited judicial resources to the case's resolution knowing that the transferor court could issue a contrary opinion in the interim that would undercut the transferee's work? Or should the transferee court wait until the transferor court decides the issue and let the case potentially sit on its dockets for months in hopes that the transferor court will, for lack of a better phrase, "do our homework" for us?

The Court in this case has elected to issue our split-decision opinion in this case as-is. Our reasoning is this: while *Freestone* and this case both deal with an overlapping dispositive issue of first impression, and while *Freestone's* holding may be contrary to the majority's opinion here, the parties in *Freestone* moved for rehearing. As of the date of this opinion's issuance, rehearing was still pending in our sister court, meaning that the Freestone opinion is not yet final. Because *Freestone* is not yet final and mandate has not issued, it is not binding and does not constitute "precedent;" thus we may issue a contrary decision in good faith without violating Rule 41.3.

We do so here not to abdicate our duty to apply our sister court's law as a virtual panel of that court, or as an affront to the deciding panel in *Freestone*; instead we simply seek to offer our sister court the product of our deliberations

Our primary purpose in construing a statute is to give effect to the Legislature's intent. *TG S-Nopec Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011). The Code Construction Act recognizes that in interpreting statutes, this Court has leeway to consider many disparate factors, regardless of whether a statute is ambiguous or not. *See* TEX.GOV'T CODE ANN. § 311.023 (West 2013). That being said, the Texas Supreme Court has instructed us to always begin our construction of the statute by using the statute's words, as the Legislature's carefully-chosen words are the truest measure of legislative intent. *TG S-Nopec Geophysical Co.*, 340 S.W.3d at 439. "[I]f a statute is unambiguous, we adopt the interpretation supported by its plain language unless such an interpretation would lead to absurd results." *Id.* "[I]n the area of tax law, like other areas of economic regulation, a plain-meaning determination should not disregard the economic realities underlying the transactions in issue." *Combs v. Roark Amusement & Vending, L.P.*, 422 S.W.3d 632, 637 (Tex. 2013).

In interpreting provisions of the Tax Code, "[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage." TEX.GOV'T CODE ANN. § 311.011(West 2013). "Words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly." *Id.* We read statutes as cohesive texts; we do not cherry-pick words and phrases, read them in isolation, and then decide they alone represent the Legislature's intent while ignoring the proper context of those words and phrase. Harmonization of all statutory provisions in a way that is consistent with legislative intent is always our primary goal, if at all possible. "[W]e consider the statute as a whole, giving effect to each provision so that none is rendered meaningless or mere surplusage."

---

and additional perspectives that the Austin court, as final intermediate appellate arbiter and court of administrative law expertise, could consider and either accept or reject. What Austin has found to be straightforward has been an issue that has resulted in differing opinions in El Paso.

*TIC Energy & Chem., Inc. v. Martin*, 498 S.W.3d 68, 75 (Tex. 2016). We presume that the Legislature intended for its statutes to be constitutional, and we will strive to give statutes a reading that renders them constitutional. TEX.GOV'T CODE ANN. § 311.021(1); *In re Allcat Claims Srv., L.P.*, 356 S.W.3d 455, 468 (Tex. 2011)(orig. proceeding).

"In addition to these general principles that guide our construction of tax code section 11.31, statutory exemptions from taxation, like the pollution-control exemption, are subject to strict construction because they undermine equality and uniformity by placing a greater burden on some taxpaying businesses and individuals rather than placing the burden on all taxpayers equally." [Internal citations, quotation marks, and alterations omitted]. *Mont Belvieu Caverns,* 382 S.W.3d at 486-87. "All doubts are resolved against the granting of an exemption." *Id*. at 487.

In interpreting the relevant Tax Code provisions, there is also a potential administrative deference principle at play. An agency's interpretation of a statute is entitled to our "serious consideration." *TG S-Nopec Geophysical Co.*, 340 S.W.3d at 438. If the statute is clear, both we and the administrative agency have a duty to apply that statute, and we may overrule an administrative interpretation of a statute. But "[i]f there is vagueness, ambiguity, or room for policy determinations in a statute or regulation . . . we normally defer to the agency's interpretation unless it is plainly erroneous or inconsistent with the language of the statute, regulation, or rule." *Id*.

B.

*The General Purpose and Provisions of Section 11.31 as a Whole*

As the principles of statutory construction make clear, the language of Subsection (m) is meaningless without context. Before we can understand what Subsection (m) means, we must first understand how the tax break in Section 11.31 works generally, what the neighboring

21

provisions around Subsection (m) mean, and where Subsection (m) fits into this legal schematic.

In reading the neighboring subsections of Section 11.31, we find these to be Section 11.31

provision's relevant highlights:

- **Subsection (a)—The property must *actually function* to control pollution as a tax break condition:** Subsection (a) defines the threshold scope of the tax break at issue: "A person is entitled to an exemption from taxation of all or part of real and personal property that the person owns and that is used wholly or partly as a facility, device, or method for the control of air, water, or land pollution."

  This provision establishes that an applicant can receive a tax break only if their property "is used wholly or partly" for pollution-control purposes. The negative implication of this provision is that if property is not used for pollution-control purposes, the tax break must be denied. Subsection (a) sets eligibility for the tax break in terms of the property's *function*.

- **Subsection (b)—Pollution-control property must also actually be adopted for the *specific purpose of complying with environmental regulations* or else the tax break must be denied:** Subsection (b) defines what a "facility, device, or method for the control of air, water, or land pollution" is: "any structure, building, installation, excavation, machinery, equipment or device, and any attachment or addition to or reconstruction, replacement, or improvement of that property, *that is used, constructed, acquired, or installed wholly or party to meet or exceed rules or regulations adopted by any environmental protection agency . . .* for the prevention, monitoring, control, or reduction of air, water, or land pollution." [Emphasis added].

  This subsection makes clear that in evaluating eligibility for this tax break, the agency must not only consider whether property has a pollution-control function, but also the *subjective purpose* behind the adoption of that property. Under Subsection (b), if an applicant shows it has adopted "green" technology that wholly or partly reduces pollution, but the purpose of that adoption was *not* to comply with regulations, the tax break must be denied.

- **Subsection (c)—Applicants must submit, and TCEQ may consider, information related to the *environmental benefits of the property, the cost of the property, the purpose of the property, and any other "financial or other data"* the Executive Director requires by rule, before a decision can be made about if the applicant is eligible for the tax break under the threshold requirements set by**

22

**Subsections (a) and (b):** Subsection (c) requires applicants to submit to TCEQ's Executive Director information regarding the following three factors: (1) the anticipated environmental benefits from the installation of the facility, device, or method for the control of air, water, or land pollution; (2) the estimated cost of the pollution control facility, device, or method; and (3) the purpose of the installation of such facility, device, or method, and the proportion of the installation that is pollution control property.

The Executive Director also has the explicit authority to require and consider additional information if the application involves property that is not "wholly" used to prevent pollution: "the person seeking the exemption shall also present such financial or other data as the executive director requires by rule for the determination of the proportion of the installation that is pollution control property." This provision gives the Executive Director the power to balance disparate factors and information in coming to his decision.

- **Subsections (d) and (h)—The Executive Director has *discretion* to determine if a particular applicant has shown they are statutorily eligible for the tax break, and, if so, in what amount; he may not grant a tax break if the applicant is ineligible for the tax break under TCEQ's rules:** Subsection (d) states: "Following submission of the information required by Subsection (c), the executive director of the Texas Commission on Environmental Quality shall determine if the facility, device, or method is used wholly or partly as a facility, device, or method for the control of air, water, or land pollution." Subsection (h) states: "The executive director may not may a determination that property is pollution control property unless the property meets the standards established under rules adopted under this section."

  These provision shows the Legislature vested a specific officer—the Executive Director of TCEQ—with decision-making authority. Indeed, on appeal, the Commissioners have no power to overrule him and substitute their own judgment for his; they may only affirm his judgment, or else remand for further proceedings. TEX.TAX CODE ANN. § 11.31(e). The Executive Director is limited to grant a tax break only when the applicant proves it is entitled to the tax break under TCEQ's internal rules.

- **Subsection (g)—The Commission has *explicit rulemaking authority to implement its own rules in deciding how it wants to administer Section 11.31 tax break applications*, so long as the rules are sufficiently specific to ensure equal and uniform application across the board *and the rules allow for distinctions to be made between proportion of property used to prevent pollution v. proportion***

23

***used to produce goods or services*. Per Third Court precedent, this rulemaking authority allows TCEQ to consider *"economic irrationality"* as a factor in assessing purpose of installation:** Subsection (g) allows the Commission to adopt rules to implement Section 11.31, provided that those rules must "(1) establish specific standards for considering applications for determinations; (2) be sufficiently specific to ensure that determinations are equal and uniform; and (3) allow for determinations that distinguish the proportion of property that is used to control, monitor, prevent, or reduce pollution from the proportion of property that is used to produce goods or services."

This subsection tracks the language of Subsection (a) and (b) and implicitly recognizes that the Executive Director can only grant tax breaks to entities with property that both *functions* as a pollution-control device and is adopted *for the purpose* of complying with environmental regulations. It also implicitly recognizes that the Commission can adopt rules, like the CAP formula, that balance the relative values of pollution control and productive aspects in determining whether the property was actually adopted for purposes of complying with environmental regulations under Subsection (b).

◼ The Third Court of Appeals, whose precedent we must apply in this case, has put a further gloss on this particular subsection and what we may infer about the Legislature's intent. In interpreting Subsection (g)(3)--the provision directing TCEQ to adopt rules of determination that account for the difference between pollution-control and productive aspects of property--, the Third Court held that this subsection "reflect[ed] legislative intent to limit the pollution-control property exemption *solely to capital investment made to comply with state or federal environmental regulations that does not yield productive benefits and would thus otherwise be irrational economically*." [Emphasis added]. *Mont Belvieu Caverns*, 382 S.W.3d at 489. The Third Court also noted that its plain-language read of Subsection (g)(3) as allowing TCEQ to consider economic irrationality as a factor was reflected in the law's legislative history. *Id.* (citing relevant portions of legislative history). Thus, in considering the purpose of property's installation under Subsection (b), the Third Court of Appeals has found that Subsection (g)(3) allows TCEQ to consider economic irrationality in its analysis, and to limit the granting of these tax breaks to situations in which compliance with an environmental regulation would be economically irrational.[15]

---

[15] Brazos Electric contends that the Third Court's interpretation of Subsection (g)(3) as containing an economic-irrationality component does not bind us as precedent because *Mont Belvieu Caverns* arose in a 100 percent-use determination context rather than a partial-use determination context like the case at bar, thereby making the true legal interpretation of Subsection (g)(3) subject to our scrutiny and potential revision. This argument misses the mark.

- **Subsection (g-1)—The Commissions' Rules of Decision apply uniformly to *all* Section 11.31 tax break applicants, *even to those properties that appear on the k-list*:** Subsection (g-1) makes clear that k-list properties are not exempt from the generally applicable rules of decision  As we will explain below, k-list properties do get some administrative preferences: under Subsection (m), k-list applicants are excused from providing one of the three required categories of information mandated by Subsection (c)(i.e., k-list applicants do not have to show their property has an environmental benefit), and Subsection (m) applicants are also entitled to expedited view within 30 days.  Still, Subsection (g-1) makes clear that k-list applicants do not otherwise receive special treatment in the administrative decision-making process and should be subject to the same standards as all other applicants.  In this context, this also means that we use the CAP formula to measure tax break eligibility, since that is the specific rule that TCEQ has chosen to implement.

In summary, after reading all the relevant provisions of Section 11.31 together and in concert with the relevant case law, we distill the Legislature's intent into four overarching points:

1) Property is eligible for a tax break under Section 11.31 if it is used wholly or partly for pollution control, (i.e. the property has a "green" *function*); AND

2) The property does not qualify as being wholly or partly for pollution control purposes unless it is adopted for the specific purpose of complying with an environmental regulation (i.e. the property has to be installed for a "green" *purpose* as defined by government regulators); AND

---

Under the principles of stare decisis, where an intermediate appellate court "gives a particular effect to a statute" in a case, and that ruling is not overruled by a higher court, "that determination is binding and conclusive on all later suits involving the same subject matter" in that district. *Messina v. State*, 904 S.W.2d 178, 181 (Tex.App.--Dallas 1995, no writ).  An interpretation of a particular statute does not change across contexts under stare decisis.  Rather, the law stays the same and it is in the application of the law to the facts that distinctions emerge. *See id.* (stare decisis does not preclude a court from deciding cases differently while applying the same law if relevant factual distinctions change the outcome).  To say otherwise disregards the principle of consistency underlying stare decisis and improperly opens the door to results-oriented decision-making.

We find that the Third Court's interpretation of the statutory language as revealing a certain legislative intent binds us.  In terms of the interpretation of Tax Code provisions at play, this case involves the same subject matter as *Mont Belvieu Caverns*.  The Third Court's interpretation of Subsection (g)(3) arose, like this case, in the context of a Section 11.31 tax application that was rejected by TCEQ and, like this case, involved a determination of the limits of TCEQ's tax break-granting authority.  The Third Court's interpretation of Subsection (g)(3) also arose, like this case, in the context of harmonizing all portions of Section 11.31 so that they may be read consistently, which is what we must endeavor to do here.  Our reading of Subsection (m) is informed by the provisions around it. *Mont Belvieu Caverns* interprets the provisions around Subsection (m) and found that economic irrationality is a factor TCEQ must consider in reaching its tax decision for Section 11.31 generally.  Whether we agree with that proposition or not, it is precedent of the transferor court that binds us, the transferee court, under TEX.R.APP.P. 48.1.

3) TCEQ must make proportional determinations as to how much of a property's purpose actually goes to pollution control, and how much goes to production purposes that generate more profit for the applicant (i.e. the purpose of this specific tax break is to *encourage compliance* with environmental regulations, *not to encourage productivity* and allow businesses to get a financial boon and then exempt their higher profits from taxation); AND

4) In considering whether the actual purpose for the installation of the subject property is pollution control, TCEQ must take into account financial realities and must consider whether it would otherwise be *economically irrational* for the applicant to adopt "green" technology and comply with governmental regulations (i.e. if it is economically rational for the applicant to adopt "green" technology, say because the technology is so productive or so much cheaper than "dirty" alternatives, then the tax break must be denied, as the Legislature intended for this tax break only to be used to coax businesses into complying with environmental regulations where *compliance would otherwise be cost-prohibitive once return on investment is taken into account*).

Under Section 11.31, a property's green function and green purpose must be balanced against the countervailing need to ensure that the tax break is given only to that portion of the property actually attributable to pollution control efforts and not profitable production efforts, and only to the extent that compliance with regulations would be economically irrational, all things considered—including overall return on investment. Having put the legal scaffolding around Section 11.31 together, we must now determine whether and to what extent Subsection (m) alters or destroys the general premises underpinning Section 11.31's purpose with respect to k-list properties.

*C.*

*Where Does Subsection (m) Fit In To Section 11.31's Overall Framework?*

Brazos Electric threads a fine needle on appeal. It does not challenge the CAP formula, but asserts only that TCEQ cannot deny k-list properties a Section 11.31, even when the CAP

formula equals zero or less,[16] because Subsection (m) contains mandatory language that always requires a positive use determination for k-list properties.

Subsection (m) states:

Notwithstanding the other provisions of this section, if the facility, device, or method for the control of air, water, or land pollution described in an application for an exemption under this section is a facility, device, or method included on the list adopted under Subsection (k), the executive director of the Texas Commission on Environmental Quality, not later than the 30th day after the date of receipt of the information required by Subsections (c)(2) and (3) and without regard to whether the information required by Subsection (c)(1) has been submitted, shall determine that the facility, device, or method described in the application is used wholly or partly as a facility, device, or method for the control of air, water, or land pollution and shall take the actions that are required by Subsection (d) in the event such a determination is made.

TEX.TAX CODE ANN. § 11.31(m).

For two reasons, we reject the argument that an application of the CAP formula that results in an answer of zero or less is prohibited by statute because that is the functional equivalent of a negative-use determination, and Subsection (m) requires the Executive Director to always issue a positive-use determination for k-list property.

First, while Subsection (m) does require the Executive Director to assume k-list properties

---

[16] We pause briefly to take issue with Brazos Electric's proposed application of the CAP formula to avoid the zero problem. Brazos Electric asks us to remand this case and instruct TCEQ that in applying the CAP formula in k-list cases, it must scrupulously do so in a way that ensures that whatever result it gets always comes out to more than zero. But Brazos Electric's proposed results-driven application of the CAP formula violates Section (g-1), which requires TCEQ to apply its administrative rules of decision-making consistently across contexts, even to k-list properties.

The CAP formula rule requires all applicants to submit proposed factors that appear on the left-side of the equal sign to TCEQ, and whatever appears on the right side of the equal sign after the objective application of the fundamental rules of mathematics is the number all parties use as reference. That is common-sense arithmetic. An approach that preordains a solution to the CAP formula and then forces TCEQ to choose variable that fit that a purpose-driven solution is an arbitrary and capricious approach that contravenes mathematical common sense. "[I]f an agency 'does not follow the clear, unambiguous language of its own regulation, we reverse its action as arbitrary and capricious.'" *Tex. Indus. Energy Consumers v. CenterPoint Energy Hous. Elect., L.L.C.*, 324 S.W.3d 95, 104 (Tex. 2010). More to the point, Brazos Electric asks for k-list applicants to receive the type of special treatment that Section (g-1) does not permit. We are unpersuaded that this approach is correct, and cannot endorse it. Further, because we find the statute *does* allow negative use determinations here, the question of whether TCEQ can reject a tax break application if the CAP equals zero or less is moot.

have an environmental benefit under Subsection (c)(1) and to grant k-list applicants expedited review, Subsection (m) also does not withdraw all discretion from the hands of the Executive Director. He must still determine to what extent the pollution-control property was actually installed "wholly or partly" for regulatory compliance purposes.

Second, in measuring the Executive Director's discretion set by the phrase "wholly or partly," we find that the "part" in "partly" is consistently used throughout Section 11.31 to mean "less than whole," which can embrace zero or negative values—and, by extension, negative use determinations. As such, when viewed with the understanding that phrases should be defined consistently throughout a statute, and when read in harmony with the other portions of Section 11.31, Subsection (m) does not stand as a bar to a zero or negative finding. Subsection (m) simply creates a presumption that k-list property has an environmental benefit, but TCEQ may still find, once all relevant factors are considered, that a specific applicant is not actually using k-list property for the purpose of complying with cost-prohibitive environmental regulations.

*1.*

*Subsection (m) Does Not Eliminate TCEQ's Discretion in Administering the Section 11.31, Nor Does it Abrogate the Executive Director's Duty to Determine Which "Part" of a k-List Property is Actually Being Used for Pollution Control Purposes and Not Productive Purposes*

In determining whether, as Brazos Electric contends, TCEQ must grant a HRSG "something" in terms of a tax break, we must address which portions of Subsection (m) are mandatory, and which are not.

At issue here is what the word "shall" means in the phrase "the executive director . . . *shall determine that* the facility, device, or method described in the application is used wholly or partly as a facility, device, or method for the control of air, water, or land pollution . . . ." [Emphasis added]. Brazos Energy is correct in pointing out that "unless the context in which the word or

28

phrase appears necessarily requires a different construction or unless a different construction is expressly provided by statute . . . '[s]hall' imposes a duty." TEX.GOV'T CODE ANN. § 311.016(3)(West 2013). "We generally construe the word 'shall' as mandatory, unless legislative intent suggests otherwise." *Albertson's, Inc. v. Sinclair*, 984 S.W.2d 958, 961 (Tex. 1999). However, words and phrases in a statute are read in context, not in isolation, and separate provisions of the same statute are read harmonically so that they do not conflict, if at all possible. *TIC Energy & Chem., Inc.*, 498 S.W.3d at 75. As the Code Construction Act and the case law both acknowledge, "shall" can mean different things in different contexts. "In determining whether the Legislature intended a provision to be mandatory or directory, we consider the plain meaning of the words used, as well as the entire act, its nature and object, and the consequences that would follow from each construction." *Albertson's, Inc.*, 984 S.W.2d at 961.

Here, the use of the word "shall" when read in context does not require the Executive Director to issue *per se* positive use determinations to k-list property. Yes, Subsection (m) is largely framed in terms of mandatory language: if property appears on the k-list, then "not later than the 30th day after the date of receipt of the information required by Subsections (c)(2)[cost of the facility] and (3)[information about the purpose of the facility], and without regard to whether the information required by Subsection (c)(1)[environmental impact information] has been submitted, *shall determine* that the facility, device, or method described in the application is used wholly or partly as a facility, device, or method for the control of air, water, or land pollution . . . ." [Emphasis added]. But "shall determine" is only half the story. The prepositional phrase in the middle of Subsection (m) is the real focus of this passage. Reworked, the sentence reads that the Executive Director "shall determine that the facility . . . is used wholly or partly" to control air pollution "not later than the 30th day after" the application is received and "without regard to

29

whether the information required by Subsection (c)(1) has been submitted." This subsection merely sets the conditions and timelines of decisions; it does not preordain a specific decision. The proper reading of this section is that it commands the Executive Director to make a decision within certain timelines, and to give k-list properties the benefit of the doubt with regard to Subsection (c)(1) information. It does not mandate a positive-use determination, but instead requires the Executive Director to exercise his discretion—in compliance with TCEQ's internal rules of decision, TEX.TAX CODE ANN. 11.31(g), (g-1)(h)—to determine proportionality ("wholly or partly") of the tax break for k-list properties.

Subsection (m) says the Executive Director shall determine the facility is "used *wholly or partly*" as pollution-control property. Notably, Subsection (m) does not say that the Executive Director *must* grant a k-list applicant *something*. The "wholly or partly" phrase in Subsection (m), which is a phrase repeated over and over again throughout Section 11.31, is especially vital to our understanding of the Executive Director's power. "Statutory terms should be interpreted consistently in every part of an act." *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002). In other subsections of Section 11.31, "wholly or partly" is a discretionary signifier showing that the Executive Director still retains discretion to determine what "part" of a property is actually attributable to pollution-control purposes. *See Mont Belvieu Caverns*, 382 S.W.3d at 488-89 (discussing the use determination process generally).

Brazos Electric does not dispute that the Executive Director retains *some* discretion over Subsection (m) applications. Thus, the true statutory question here is not whether the Executive Director has discretion, but how far this discretion goes for k-list properties. More to the point: bearing in mind that phrases should generally be interpreted consistently throughout an act, and given that use of the phrase "partly" in other parts of Section 11.31 allows the Executive Director

30

to make negative use determinations generally, does "partly" nevertheless mean something different in Subsection (m) than it does in other parts of Section 11.31?

We think not.

*2.*

*TCEQ's Discretion is Not Statutorily Limited to Making Non-Zero Pollution Control Findings for k-List Properties*

a.<br>
The Plain Contextual Meaning of "Part" As Used in the Section 11.31 Means "Less than Whole," Which Embraces Zero or Negative Amounts; Its Use in Subsection (m) Indicates a Legislative Intent to Allow for Negative Use Determinations for k-List Properties

Brazos Electric argues that notwithstanding the use of the phrase "wholly or partly" as a discretionary signifier that encompasses negative use determinations in other portions of the statute, "partly" takes on a new meaning in Subsection (m), one that forces the Executive Director to grant the electric company "something." Why? In Brazos Electric's view, the "part" in "partly" has only one possible meaning—it necessarily means "more than nothing." *See* "Partly," MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 904 (11th ed.)(defining "partly" as "in some measure or degree; PARTIALLY").

We disagree that "partly" as used in Subsection (m) absolutely requires the Executive Director to grant k-list applicants "more than nothing." To say that the "part" in "partly" conclusively means "more than nothing" and thus cabins the agency's discretion into finding non-zero use *per se* does not acknowledge the inherent elasticity of the language at issue. We interpret words in light of common understanding and definitions. Contrary to Brazos Electric's assertion, "part" as commonly understood is not a word with one sole definition. Brazos Electric cites to Merriam-Webster's Collegiate Dictionary as a source, but even in that dictionary, multiple definitions of the word emerge. Indeed, it is reasonable to understand "part," "partly," and

31

"partially" in ways that cut both for and against both parties. "Part" can mean "less than whole" (which embraces zero or negative values),[17] or "part" can mean "more than nothing" (which excludes zero and negative values).[18] So which definition do we apply here? Both are reasonable, commonly understood interpretations of that word. At best, Brazos Electric's proposed definition only conjures up a linguistic ambiguity. "Ambiguity exists if reasonable persons can find different meanings in the statute." *Tex. Dep't of Pub. Safety v. Swierski*, 49 S.W.3d 417, 419 (Tex.App.--Fort Worth 2001, no pet.).

But we do not read words in isolation from the subsection in which they appear, and we do not read subsections in isolation from their place in a statutory scheme. "The meaning of a word that appears ambiguous when viewed in isolation may become clear when the word is analyzed in light of the terms that surround it." *TG S-NOPEC Geophysical Co.*, 340 S.W.3d at 441. Here, when Subsection (m) is read in the context of the statute as a whole, giving effect to the Legislature's intent as expressed in the text it adopted, the meaning becomes obvious because the word appears in a phrase that is consistently applied across various subsections of Section 11.31—"partly" means "less than whole," which can also mean "zero."[19] The scope of the Executive Director's discretion for k-list properties is the same as the scope of his discretion for Section 11.31 applications generally: he is confined to granting tax breaks only where a facility, device, or

---

[17] *See, e.g.,* Part, Dictionary.com, http://www.dictionary.com/browse/part ("Part . . . refer[s] to something that is less than the whole."); "Part," Merriam-Webster's Collegiate Dictionary 902 (11th ed.)("*syn* PART, PORTION, PIECE, MEMBER, DIVISION, SECTION, SEGMENT, FRAGMENT mean something less than the whole. PART is a general term appropriate when indefiniteness is required . . .").

[18] "Partly," Merriam-Webster's Collegiate Dictionary 904 (11th ed.)(defining "partly" as "in some measure or degree; PARTIALLY").

[19] Even if we are wrong that "part" when read in context clearly means "less than whole," as we have said, the best that Brazos Electric can do is present this Court with a linguistic ambiguity in the statute. "Part" can just as easily mean either "more than nothing" as it can mean "less than whole." When a statute is ambiguous and can be read multiple reasonable ways, we defer to the agency's choice among the reasonable interpretations. *Mont Belvieu Caverns, L.L.C.*, 382 S.W.3d at 487. That means that under agency deference principles, we would still be required to recognize that that statute allows for negative-use determinations, even for k-list properties.

method was used *wholly or partly* as a method of controlling pollution. *See* TEX.TAX CODE ANN. § 11.31(a). If no part of the device is being used for pollution control purposes, the tax break must be denied.

As TCEQ intones in its brief, purpose of adoption matters even when it comes to k-list property, and as the agency posits in its colorful hypothetical, an eccentric billionaire cannot simply purchase k-list property like a HRSG, bury it in the desert outside Marfa, call it an art installation, and expect to receive a tax break simply because HRSGs are on the k-list. Subsection (m) still requires the Executive Director to make a use determination. But to read Subsection (m)'s "shall determine that" language as mandating a tax break in every situation ignores the meaning that the phrase "wholly or partly" has acquired in other parts of the same statute; indeed, it writes those words out of Subsection (m) completely. It also ignores other provisions of Section 11.31 requiring the Executive Director to carefully weigh disparate factors in making a use determination. We must give all words in a text meaning if possible. The statute requires the Executive Director to make a decision and to grant k-list applicants certain administrative preferences in terms of initial burden and speed of decision, but nothing in Subsection (m) clearly restricts TCEQ to solely making positive-use determinations for k-list properties.

b.

Brazos Electric's Alternative Reading is Unworkable and Would Invite Constitutional Challenges

We are further convinced TCEQ's plain language reading of Subsection (m) is correct by the fact that Brazos Electric's alternative reading is not complete or workable. For example, while Brazos Electric maintains that Subsection (m) requires a non-zero tax break, the company also never specifies how much the minimum acceptable tax break for k-list properties is under its reading of Subsection (m). Is it 10 percent? Is it 65 percent? Is it a *de minimis* amount awarded

33

simply to vindicate rights?  Brazos Electric never says, nor does it explain how we or TCEQ could ascertain what the minimum tax rate for k-list properties from Subsection (m)'s facial silence on that issue.

These questions are not merely rhetorical.  We are mindful of our duty to fashion useable standards that the agency can apply on remand and other courts may apply in the future.  *See* TEX.GOV'T CODE ANN. § 311.021 (West 2013)(instructing courts to presume the Legislature intends to write statutes that have "a result feasible of execution").  In its prayer, Brazos Electric simply asks us to declare that the statute requires a certain minimum tax rate not apparent from the face of Section 11.31, and then remand the case to TCEQ with orders to figure out what that ephemeral non-zero tax rate might be.  Brazos Electric's inability to point to specific, workable standards we can apply in determining a "minimum tax break" cuts against the validity of that interpretation, particularly when TCEQ's approach harmonizes Subsection (m) with all parts of Section 11.31.  TCEQ's is the only sensible, workable reading of Subsection (m)'s plain language. Subsection (m) states that if a k-list device is installed for air pollution control purposes, "the executive director . . . shall determine that the . . . device . . . is used wholly or partly as a . . . device . . . for the control of air . . . pollution[.]"  We cannot, at Brazos Electric's request, strike out the phrase beginning "is used wholly or partly" from Subsection (m) and then replace it with the words "is entitled to a non-zero tax break" in an attempt to make the statute say what we think the Legislature was trying to say.  We are not legislators, nor are we the Congress' copy editors. We take the law as we find it and interpret the law as written.  *See Tex. Lottery Comm'n v. First State Bank of DeQueen*, 325 S.W.3d 628, 637-38 (Tex. 2010)(courts may not "fix" legislative "mistakes" made in a statute to comport with what they think the Legislature meant, but must instead follow "direct and clear statutory language that does not create an absurdity").

34

We also hesitate to endorse Brazos Electric's reading because if Subsection (m) applies as broadly as Brazos Electric suggests and encompasses positive use determination for businesses that would otherwise recover increased marginal costs with return on investment, that could result in Subsection (m)'s constitutionality being called into question. "When construing statutes we presume the Legislature intended them to comply with the Texas Constitution." *In re Allcat Claims Serv., L.P.*, 356 S.W.3d 455, 468 (Tex. 2011)(orig. proceeding). "[I]n construing amendments to the Texas Constitution we ascertain and give effect to the plain intent and language of the framers of the amendments and of the people who adopted them, beginning with and giving primacy to the language that was adopted." *Id*. The relevant constitutional provision authorizing the enactment of Section 11.31 states:

> The legislature by general law may exempt from ad valorem taxation all or part of real and personal property used, constructed, acquired, or installed wholly or partly to meet or exceed rules or regulations adopted by any environmental protection agency of the United States, this state, or a political subdivision of this state for the prevention, monitoring, control, or reduction of air, water, or land pollution.

TEX.CONST. art. VIII, § 1-*l*(a).

As with Section 11.31, the constitutional provision authorizing the tax break calls for proportionality in use determinations. We read this provision as allowing the Legislature to grant tax breaks to properties that actually serve pollution control functions. Brazos Electric insists that Subsection (m) requires TCEQ to grant k-list property applicants some amount of a tax break, regardless of whether it was adopted for the purpose of pollution control. As we read Brazos Electric's argument, k-list property would be entitled to a tax break even if it were being used solely as production equipment. Not only does this reading contravene the amendment's plain language mandate, it contravenes the intent of this amendment's framers. As the House Research Organization noted, the framers of Proposition 2—which would eventually become TEX.CONST.

35

art. VIII, § 1-*l*—did not intend to grant the Legislature the power to give tax breaks to production

equipment. Rather, the specific concern of proponents was addressing the rising cost of regulatory

compliance and ensuring that Texas both incentivized compliance and remained competitive with

other states who provided similar tax off-sets. Supporters made clear that they did not intend for

the Legislature to pass tax breaks that would simply make facilities more productive, and

opponents specifically complained that the Legislature should not be allowed to subsidize

profitable ventures veiled as pollution control efforts:

> Proposition 2 would amend the Texas Constitution to permit the Legislature to exempt from property taxation all or part of property used, constructed, acquired or installed wholly or partly to meet federal, state or local regulations for the prevention, monitoring, control or reduction of air, water or land pollution.

> .         .         .

> Supporters Say: Proposition 2 would promote voluntary compliance with environmental regulations and help preserve jobs by offering a property-tax exemption for pollution control.

> .         .         .

> It is unfair to tax businesses on property they are required by law to purchase. There is a growing public consensus that businesses should be required to minimize pollution, but most companies that must buy pollution control devices now were doing nothing illegal in the past. They should not face the double burden of mandatory expenses and increased taxes paid on the property value added by those expenses.

> Proposition 2 is not some benefit just for big business. Small companies would be entitled to seek the same exemptions as a large refinery. Many small businesses -- including dry cleaners, gas stations, auto body shops, dentists, printers and photo labs -- face large expenses to comply with new environmental regulations. The tax exemption would provide an economic incentive for these small companies, which generate a large proportion of all pollution, to comply fully with all environmental requirements.

> .         .         .

> Only the value of that part of a new device that actually relates to pollution control would receive an exemption. A device that only increased a plant's productivity or

capacity would not qualify for an exemption. All applications for exemption would have to be certified by the state and go through a state permit process, assuring that application of the exemption would be uniform and nondiscriminatory.

.        .        .

Opponents Say: . . . Because many pollution control devices also increase the productivity of a plant, a company may reap economic benefits from pollution control and does not need an extra benefit in the fo[rm] of a government subsidy.

House Research Org., *Special Legislative Report No. 184, 1993 Constitutional Amendments: The November 2 Election* (Aug. 30, 1993), at 8-11, available at http://www.lrl.state.tx.us/scanned/Constitutional_Amendments/amendments73_HRO_1993-11-02.pdf.

Brazos Electric's proposed reading would leave Subsection (m) open to a potential constitutional challenge that the Legislature exceeded its constitutional authority by enacting Subsection (m) and granting a *per se* tax break to k-list properties, even if they were being used solely for productive purposes. We believe that TCEQ's reading of Subsection (m) not only harmonizes all Section 11.31's provisions together, but it is also consistent with the intent of the constitutional amendment's framers and does not leave Subsection (m) open to a potential constitutional attack.

c.

Legislative History Confirms k-List Was Created to Speed Up the Administrative Process for Certain Properties, Not Eliminate Agency Discretion

We find the statute to be unambiguous as written. The text of Subsection (m) can be harmonized with the remaining portions of Section 11.31, meaning that our search for legislative intent should end with the text itself and consideration of Subsection (m)'s legislative history is unnecessary. Nevertheless, while we may not use legislative history to contravene a statute's plain language, we may still consult legislative history for other purposes, such as to bolster a plain

37

reading of the statute or else to clarify any ambiguities in an unclear statute. *See Mont Belvieu Caverns*, 382 S.W.3d at 489 (using legislative history to bolster its conclusion that its plain language reading of the statute was correct). While the legislative history of Subsections (k) and (m) is scant, what little on-point history we have found confirms that the Legislature intended for TCEQ to retain discretion to deny tax breaks, even for items that appear on the k-list, and that the Legislature's primary intent in adopting the k-list was to eliminate some administrative hurdles for certain tax applicants.

The k-list and Subsection (m) have their genesis in House Bill 3732, proposed during the 80th Legislature's Regular Session. H.B. 3732 contained a package of several incentives aimed generally at promoting clean energy, and when was H.B. 3732 was ultimately passed, it made changes and additions to numerous provisions of the Texas Tax, Health, and Government Codes. With respect to Section 11.31 specifically, H.B. 3732 added Subsection (k) and (m). *See* Act of Sept. 1, 2007, 80th Leg., R.S., ch. 1277, § 4, 2007 TEX.GEN.LAWS 4261, 4264 (codified at TEX.TAX CODE ANN. §§ 11.31(k), (m)).

In a bill analysis generated April 25, 2007, the day that the House Committee on Energy Resources unanimously voted the bill out of committee, the Texas House Research Organization outlined the properties that would eventually be included on the k-list, including HRSGs, and specifically explained what placement on the k-list would mean:

> The bill would require the TCEQ to establish a non-exclusive list of pollution-control facilities, devices, or methods, which would have to be updated at least once every three years and include:
>
> .    .    .
>
> • heat recovery steam generators;
>
> .    .    .
>
> If an applicant intended to seek a tax exemption or tax rollback, used one of the

38

methods from the list above, and detailed the estimated cost and purpose of a project, *the executive director of TCEQ would have no more than 30 days to determine **if** the facility, device, or method was used wholly or partly as a method of controlling pollution* and take actions as required by Tax Code, 11.31(d), without regard to whether information had been submitted about the anticipated environmental benefits of the project. [Emphasis added].

House Comm. on Energy Resources, Bill Analysis, Tex. H.B. 3732, 80th Leg., R.S. (Apr. 25, 2007).

This bill analysis shows that the Legislature intended for Subsections (k) and (m) to provide k-list properties with certain administrative benefits so as to streamline and expedite considerations of those applications. The bill analysis also shows the Legislature clearly contemplated that even under expedited consideration, the Executive Director would retain discretion to issue a negative use determination if the applicant failed to establish eligibility for the tax break. The Legislature's intent in establishing the k-list was to make the administrative process more streamlined, not to overrule the Executive Director's judgment by legislative fiat and create a ministerial duty to grant a tax break. All things considered, Brazos Electric's reading of Subsection (m) is untenable.

4.
*Conclusion: What Placement on the k-List Actually Means*

The plain language of Subsection (m), properly harmonized with its neighboring provisions, does not reflect an unequivocal intent to give every k-list applicant some kind of tax break, even where k-list property is not subjectively used for pollution control purposes, but only to strengthen a company's bottom line. On the contrary, the use of the phrase "wholly or partly" in Subsection (m) signifies that the Legislature intended to leave the Executive Director's discretion to issue negative use determination intact. The legislative history of H.B. 3732 confirms this intent. This reading is workable, and it is consistent with the text and intent of the enabling constitutional amendment.

39

Brazos Electric largely argues that it would be bad policy for TCEQ to deny HRSGs a tax break. "[P]olicy arguments cannot prevail over the words of the statute." [Internal quotes omitted]. *In re Blair*, 408 S.W3d 843, 869 (Tex. 2013). If, as Brazos Electric claims, the Legislature *did* intend for all k-list applicants to get "something" in terms of a tax break, then the solution is not for us to edit the statute, insert or remove words, and fashion the tax break into something we think the Legislature and the people of this State would approve of. That is legislating from the bench, and it would necessarily involve making a slew of policy judgment relating to state energy goals and the shifting of burdens on taxpayers that are beyond both our constitutional mandate and our institutional competence. We only say what the law is, and we believe our interpretation of the law as written is correct. If the statute was miswritten in a way that does not comport with the Legislature's actual intent, the Legislature is free to amend the statute to make its will clearer.

Placement on the k-list entitles an applicant to a presumption that the property has an environmental benefit under Subsection (c)(1). It entitles an applicant to expedited review within 30 days. It does not entitle an applicant to a *per se* tax break.

Issue One is overruled.

## II.

### Informal Rulemaking In Violation of the APA

*Has TCEQ Adopted a Policy of Denying All HRSGs a Tax Break Or Else Removed HRSGs from the k-List Without First Undergoing Formal Rulemaking As Required By Subsection (l)?*

In Issue Two, Brazos Electric asserts that TCEQ has "decided to apply the CAP equation in a manner that guarantees that a HRSG will never qualify for the tax exemption[,]" thereby effectively removing HRSGs from the k-list without first undertaking the formal rulemaking process for k-list removal as required by TEX.TAX CODE ANN. § 11.31(*l*). Brazos Electric also

avers that multiple statements that the Executive Director made in court filings are "irrefutable" proof that TCEQ has informally adopted a policy of denying tax breaks to all HRSGs, despite the fact that the Legislature has already identified HRSGs as clean technology. Specifically, Brazos Electric directs our attention to the following statements made in the Executive Director's Response Brief in the appeal before the TCEQ commissioners:

- "HRSGs do not provide an environmental benefit."

- "HRSGs are not used wholly or partly to prevent, monitor, or control air, water, or land pollution."

- "HRSGs are not pollution control devices."

We deal with Brazos Electric's evidentiary contention first, and will not belabor this point: arguments made by an agency in a legal brief are not "rules." *See Tex. Mut. Ins. Co. v. Vista Cmty. Med. Ctr., L.L.P.*, 275 S.W.3d 538, 555 (Tex.App.--Austin 2008, pet. denied). To hold that every statement an agency makes, including those made in court filings, constitute "rules" would cripple an agency's ability to "carry out its legislative functions[,]" "state its reasons for denying a petition to adopt a rule[,] or file a brief in a court or agency proceeding[.]" *Id*. While Brazos Electric is correct that the Executive Director has made broad statements about the inadequate environmental benefits of HRSGs in legal briefs at various stages of litigation, these statements are no evidence of intent to adopt a widespread policy applicable in every case. We must take these statements in context and recognize that these are comments made in the course and scope of adversarial advocacy before the courts. *Id*.

As for Brazos Electric's sweeping allegations that TCEQ essentially adopted an informal new rule that will foreclose all HRSG applications moving forward, the company cites no factual or legal authority in support of this proposition. Brazos Electric asserts that (1) TCEQ has stated in some way that it will always plug in the cost of a new boiler into the Capital Cost Old portion

41

of the CAP when dealing with HRSG applications, and that (2) use of a new boiler's cost as the Capital Cost Old variable in the CAP formula will guarantee that every HRSG tax break application from here on out will fail.

But Brazos Electric does not direct us to anything competent in the record that says that TCEQ will use the cost of a new boiler as the "Capital Cost Old" value in the CAP for each and every HRSG application, nor does Brazos Electricity explain how TCEQ's application of the CAP will make every application for a HRSG tax break mathematically futile. Instead, Brazos Electric states in its brief that "the TCEQ does not deny that the variable it insists on using for 'Capital Cost Old' in the CAP formula, which applies to all exemption applications, will always yield a negative result for HRSGs." But TCEQ *does* deny that its application of the CAP formula will always yield negative results, meaning that we cannot rely on Brazos Electric's bare assertion as dispositive evidence, particularly given the lack of citations. *See* TEX.R.APP.P. 38.1(g)("In a civil case, the court will accept as true the facts stated unless another party contradicts them. The statement must be supported by record references.").[20] TCEQ also denies making any attempt to remove HRSGs from the k-list, noting that when it last performed its statutorily-mandated triennial review of k-list technologies in August 2014, it ultimately elected not to remove any technologies from that list. *See* 39 TEX.REG. 6483, 6484 (2014)(Tex. Comm'n on Envt'l Quality, Tax Relief for Property Used for Environmental Protection, Background and Summary of Factual Basis for the Adopted Rules)("A triennial review is required for the Expedited Review List by § 17.17(b), in accordance with Texas Tax Code, § 11.31(l). The Expedited Review List has been reviewed

---

[20] TCEQ does admit that since reverting from Tier IV review back to the CAP formula, it has denied all the HRSG applications it has received. However, TCEQ explains that the percentages for varying facilities have differed greatly, and that one facility applying for an HRSG tax break received a -2% rating, right on the cusp of a positive-use determination. TCEQ maintains that if the price of electricity or steam had been different, the NPVMP would have been lower, and that facility may have obtained a positive-use determination.

and the commission determined that no updates are necessary. Therefore, no charges to § 17.17 were proposed for this rule-making.").

The Rules of Appellate Procedure requires factual assertions to be supported by record references. TEX.R.APP.P. 38.1(g). Brazos Electric's factual assertions in this portion of its brief are not supported by record citations. Beyond citations to TCEQ's pleadings and statements made in the course of litigation—which are incompetent evidence here—and beyond insinuations that the Executive Director is biased against HRSG technology, Brazos Electric never directs our attention to any document or piece of evidence that would constitute proof of an informal rule adoption. It may be that there is administrative resistance to recognizing the environmental benefits of HRSGs, but Brazos Electric has failed to prove up that thesis here.

In addition to citing to facts in the record, litigants in the Court of Appeals must also cite legal authorities in support of their arguments. TEX.R.APP.P. 38.1(i). Although Brazos Electric cites generally to cases that say an agency action cannot conflict with a statute, and although Brazos Electric generally maintains that TCEQ's actions conflict with the statute because they are ultra vires, Brazos Electric never puts those principles in context. *See Nevarez v. Inv. Retrievers, Inc.*, 324 S.W.3d 238, 240 (Tex.App.--El Paso 2010, no pet.)(failure to explain how cases cited apply to a particular case does not meet TEX.R.APP.P. 38.1 briefing standard); *Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex.App.--El Paso 2007, no pet.)(holding that while briefing is sufficient "if it directs the reviewing court's attention to the error about which the complaint is made," briefing requirements are not met when litigant fails to "provide substantive analysis of the legal issue"). Brazos Electric's brief (1) fails to cite authority defining what a "rule" is for purposes of the Administrative Procedures Act, (2) fails to apply the definition in explaining why TCEQ's actions constituted the adoption of a "new rule," (3) fails to explain what the significance of

43

adopting a new rule without complying with the APA is, and (4) fails to request specific relief for this alleged violation of the APA.

It is not the job of this Court to connect unrelated dots, hunt down relevant authority, or speculate as to what exactly it is a party is attempting to argue or what relief it is requesting. Doing so would risk placing this Court in the position of having to guess what a litigant means, or worse— inadvertently becoming an advocate for a party as the Court attempts to fill in the blanks. *Valadez*, 238 S.W.3d at 845. The briefing rules also serve a claims-processing purpose, and particularly in cases regarding technical subject matter, and particularly in cases that are granted oral argument before this Court, good briefing matters. "Failure to provide citations or argument and analysis as to an appellate issue may waive it." *Ross v. St. Luke's Episcopal Hosp.*, 462 S.W.3d 496, 500 (Tex. 2015). That is the situation here.

Issue Two is waived for lack of adequate briefing.[21]

## III.

## Improper Application of CAP Formula

---

[21] Even if we are incorrect and the issue is adequately brief, we have found no evidence in the record that would show TCEQ adopted a statement of general applicability regarding HRSG applicants, that such a statement was binding, or that such a statement would have the practice effect of "removing" HRSGs from the k-list. A rule under the APA:

  (A) means a state agency statement of general applicability that:
       (i) implements, interprets, or prescribes law or policy; or
       (ii) describes the procedure or practice requirements of a state agency;
  (B) includes the amendment or repeal of a prior rule; and
  (C) does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures.

TEX.GOV'T CODE ANN. § 2001.003(6)(West 2016).

The process Brazos Electric describes appears to be more akin to an application of nonbinding guidelines in the process of evaluating rights under a properly promulgated rule. *See Tex. State Bd. of Pharmacy v. Witcher*, 447 S.W.3d 520, 529 (Tex.App.--Austin 2014, pet. denied)("nonbinding evaluative guidelines that take into consideration case-specific circumstances" are generally not "rules" under the APA); *Slay v. Tex. Comm'n on Envtl. Quality*, 351 S.W.3d 532, 546 (Tex.App.--Austin 2011, pet. denied)(guidelines TCEQ staff used in determining when to recommend administrative sanctions were not "rules"). Based on the record before us, we would find on the merits that HRSGs remain on the k-list and TCEQ has not adopted any policies that would undercut that fact.

Finally, in Issue Three, Brazos Electric argues that TCEQ acted arbitrarily and capriciously by selecting a boiler as technology that was comparable to a HRSG and applying the cost of a boiler as the Capital Cost Old variable in the CAP formula. TCEQ defends its choice of the boiler as being reasonable, but the agency asserted during oral argument that the boiler issue is a red herring, and we may affirm TCEQ's decision to reject Brazos Electric's tax request on alternative grounds. Namely, TCEQ maintains that Brazos Electric has flipped the threshold burden of proof in its brief; it was actually Brazos Electric's burden to establish it was entitled to a tax break, and that burden included furnishing comparable variables that would still result in a positive outcome once they were run through the CAP formula. Using that burden of proof and applying the abuse of discretion standard, TCEQ argues we cannot overturn TCEQ's rejection of Brazos Electric's application because its decision regarding the CAP variables fell within the zone of reasonable disagreement.

We agree with TCEQ on all points.

A.

*Standard of Review for Administrative Decisions*

The standard of review "defines the relationship between this Court and the court below." *State v. Villegas*, 506 S.W.3d 717, 727 (Tex.App.--El Paso 2016, pet. granted). "These standards frame the issues, define the depth of review, assign power among judicial actors, and declare the proper material to review." [Internal citation and quotation marks omitted]. W. Wendall Hall et al., *Hall's Standard of Review in Texas*, 42 ST. MARY'S L.J. 1, 9 (2010). The standard of review framework limits this Court's ability to review lower court rulings and constrains our power to overturn them.

Our review of agency decisions is similarly limited. We review TCEQ's determination of

45

entitlement to a Section 11.31 tax break in a non-contested case such as this one under the arbitrary and capricious standard. *Mont Belvieu Caverns*, 382 S.W.3d at 485. Our power on appeal under this standard is extremely limited. On arbitrariness review, "[a] court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *Fed. Energy Reg. Comm'n v. Elec. Power Supply Ass'n*, 136 S.Ct. 760, 782, 193 L.Ed.2d 661 (2016)(discussing meaning of "arbitrary and capricious" in federal administrative context); *accord* 2 TEX.JUR.3D ADMINISTRATIVE LAW § 237. Instead, "[a]n administrative agency is said to act arbitrarily or capriciously where, among other things, it fails to consider a factor the Legislature has directed it to consider, considers an irrelevant factor, or considered relevant factors but still reaches a completely unreasonable result." *City of Waco v. Texas Comm'n on Envtl. Quality*, 346 S.W.3d 781, 819 (Tex.App.-Austin 2011, pet. denied).

"Ultimately, we are concerned not with the correctness of the Commission's decision, but its reasonableness." *Employees Retirement Sys. of Tex. v. Garcia*, 454 S.W.3d 121, 132 (Tex.App.--Austin 2014, pet. denied). In determining reasonableness, we give agencies broad leeway. "The test is not whether the agency made the correct conclusion in our view, but whether some reasonable basis exists in the record for the agency's action." [Internal citation omitted]. *Id*. "Our review of the administrator's decision is not complex or technical; we must assure the decision falls somewhere on a continuum of reasonableness—even if on the low end." [Internal citation and alterations omitted]. *Phillips v. Metro. Life Ins. Co.*, 405 S.W.3d 880, 891 (Tex.App.--Dallas 2013, no pet.)(defining arbitrary and capricious standard of review in ERISA context). We take an administrator's stated reasons for a decision at face-value and "must judge the validity of the decision according to the basis upon which it purports to rest." *Smith v. Hous. Chem. Srvs., Inc.*, 872 S.W.2d 252, 267 (Tex.App.--Austin 1994, writ denied). "The [subjective] thought

46

processes or motivations of an administrator are irrelevant in the judicial determination whether the agency order is reasonably sustained by appropriate findings and conclusions that have support in the evidence." [Internal citation and alterations omitted]. *Id*.

We only "remand for arbitrariness if we conclude that the agency has not genuinely engaged in reasoned decision-making." [Internal quotations omitted]. *CPS Energy v. Pub. Util. Comm'n*, -- S.W.3d --, No. 03-14-00340-CV, 2017 WL 744694, *6 (Tex.App.--Austin Feb. 24, 2017, no pet.h.). If the agency did not act in an arbitrary or capricious manner, we must affirm the agency decision. *Tex. Health Facilities Comm'n*, 665 S.W.2d at 452.

"In tax-exemption cases, the claimant . . . bears the burden of 'clearly showing' that it falls within the statutory exemption." *Tex. Student Housing Authority v. Brazos Cty. Appraisal Dist.*, 460 S.W.3d 137, 140-41 (Tex. 2015). Tax exemptions may not "be raised by implication, but must affirmatively appear, and all doubts are resolved in favor of taxing authority and against the claimant." *Id*. at 141.

B,

*Analysis*

A large part of Brazos Electric's argument in Issue Three finds its footing in the premise that the statute constrains the Executive Director's discretion in making use determinations for k-list properties. We dispelled that argument in our resolution of Issue One. The only issue remaining whether the Executive Director's decision was so unreasonable as to be arbitrary and capricious. The briefing on this issue is sparse, but still sufficient to warrant our review under the Rules of Appellate Procedure. We will do our best to analyze the reasonableness of the Executive Director's decision in light of the points Brazos Electric raised in its brief.

Throughout the application process, Brazos Electric ultimately submitted a total of five

47

different proposed calculations of its tax break rate to TCEQ. Two of those, submitted in the Johnson County application under Tier IV review, did not apply the CAP. Brazos Electric has abandoned those non-CAP applications on appeal.[22] Instead, Brazos Electric argues before this Court that TCEQ improperly rejected the company's proposed CAP variables which would have resulted in the following partial use determinations:

- For both Johnson and Jack County facilities, a 100% use determination (using $0 as the value for Capital Cost Old and the NPVMP production variable);

- For its Johnson and Jack County facilities, use determinations of +64.29% and +74.66% respectively (using $0 as the Capital Cost Old value, and applying a non-zero NPVMP production value); and

- For its Johnson and Jack County facilities, use determination of +63.76% and +74.52% respectively (using the cost of a spooling device as the Capital Cost Old value).

We find that TCEQ did not act arbitrarily or capriciously in rejecting these proposed formulations of the CAP.

*1.*
*Administrative Rules for Determining CAP Variable Values*

Recall that the CAP formula applies as follow:

---

[22] As we noted previously, the Johnson County application, while filed under ad hoc Tier IV review, was subject to having Subsection (g-1)'s uniformity-of-decision requirement imposed on it retroactively, meaning that TCEQ had to use the same method of decision it applied to other applicants (i.e. the CAP formula) for k-list applicants. *See* TEX. TAX CODE ANN. § 11.31(g-1)(standards of decision adopted by TCEQ must be applied to all classes of applicants, including k-list applicants); Act of May 25, 2009, 81st Leg., R.S., ch. 962, § 3, 2009 TEX. GEN. LAWS 2556, 2557-58 (Subsection (g-1) applies to all applications filed after January 1, 2009, that were not yet final as of September 1, 2009).

$$\frac{(x_1 - x_2) - y}{x_1} \cdot 100 = z\,\%$$

$x_1$ : Capital cost of the actual equipment at issue, with pollution control feature (Capital Cost New)
$x_2$ : Capital cost of comparable equipment without pollution control feature (Capital Cost Old)
$y$ : Net value of any marketable material generated by equipment over lifetime (NPVMP)
· : Multiplication sign
$z$ : Percentage of equipment's capital cost attributable to pollution control/tax break percentage

*Table 2.1*

TCEQ's administrative rules set definitions for Capital Cost New ($x_1$), Capital Cost Old ($x_2$), and NPVMP ($y$). "Capital Cost New is the estimated total capital cost of the new equipment or process." 30 TEX.ADMIN.CODE § 17.17(c)(1) fig., n. 2. "Capital Cost Old is the cost of comparable equipment or process without the pollution control." *Id*. at n.3. Section 17.17(c)(1) recognize four alternate standards for calculating the Capital Cost Old (CCO) variable:

[3.1] If comparable equipment without the pollution control feature is on the market in the United States, then an average market price of the most recent generation of technology must be used.

[3.2] If the conditions in variable 3.1 do not apply and the company is replacing an existing unit that already has received a positive use determination, the company shall use the CCO from the application for the previous use determination.

[3.3] If the conditions in variable 3.1 and 3.2 do not apply and the company is replacing an existing unit, then the company shall convert the original cost of the unit to today's dollars by using a published industry specific standard.

.    .    .

[3.4] If the conditions in variable 3.1, 3.2 and 3.3 do not apply, and the company can obtain an estimate of the cost to manufacture the alternative equipment without the pollution control feature, then an average estimated cost to manufacture the

49

unit must be used. The comparable unit must be the most recent generation of technology. A copy of the estimate must be provided with the worksheet including the specific source of the information.

*Id.*

The NPVMP is defined as:

The net present value of the marketable product recovered for the expected lifetime of the property . . . Typically, the most recent three-year average price of the material as sold on the open market should be used in the calculation. . . .[23]

*Id.*

Again, we note that Brazos Electric has not challenged any of these definitions or rules of decision as being substantively or procedurally defective. As such, these rules and definitions bind us in deciding whether the agency acted arbitrarily or capriciously.

We interpret administrative regulations and rules as questions of law, using the same principles of textual construction as with statutes. *TG S-NOPEC Geophysical Co.*, 340 S.W.3d at 438. "In construing a Commission rule, our primary objective is to give effect to the Commission's intent." *Rodriguez v. Serv. Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999). Undefined terms are "typically given their ordinary meaning" unless "a different or more precise definition is

---

[23] On appeal, neither side argues that the NPVMP was calculated incorrectly. Nevertheless, as background information, the NPVMP under the administrative rules is calculated using the following formula:

$$NPVMP = \sum_{f=1}^{n} \frac{(\text{Marketable Product Value - Production Cost})}{(1 + \text{Interest Rate})}$$

- $n$ = Estimated useful life of equipment in years
- Marketable Productive Value = (1) the retail value of the product produced by the equipment for one year periods (typically the most recent three-year average price of the material as sold on the open market), or (2) value assigned to material for internal accounting purposes, if material is used as an intermediate material in a production process.
- Production Cost = costs directly attributed to the production of the product, including raw materials, storage, transportation, and personnel, but excluding non-cash costs, such as overhead and depreciation.
- Interest Rate = 10%

*See* 30 TEX. ADMIN. CODE § 17.17(c)(2).

apparent from the term's use" in context. *TG S-NOPEC Geophysical Co.*, 340 S.W.3d at 439.

*2.*

*TCEQ Could Rationally Reject Brazos Electric's Use of "$0" as the Capital Cost Old and Production Variables in Johnson County Application, Resulting in a 100% Use Determination; Brazos Concedes that HRSGs Have Productive Value, and Under **Mont Belvieu Caverns**, Equipment With Productive Value Cannot Receive a 100% Use Determination as a Matter of Law*

We deal first a proposed 100 percent use determination application that Brazos Electric submitted for its Johnson County facility. We find that TCEQ did not act arbitrarily or capriciously by rejecting this particular formulation.

In response to a notice of technical deficiency issued by the Executive Director in its Johnson County application, Brazos Electric submitted a proposed recalculation of the CAP using a $0 value for Capital Cost Old and a $0 value for the NPVMP production factor, resulting in a 100 percent use determination. Brazos Electric explains that it selected $0 as the Capital Cost Old factor because there is no comparable technology to a HRSG, and it selected $0 as the output value because without attaching the HRSG to a steam turbine, the steam is useless and of no value. Therefore, the productive equipment is not the HRSG, it is the steam turbine.

As TCEQ correctly says in its brief, this formulation is unreasonable out of hand because it would require TCEQ to grant a 100 percent use determination when at maximum, Brazos Electric can only qualify for a partial use determination. We agree that this issue is governed squarely by *Mont Belvieu Caverns*.

In *Mont Belvieu Caverns*, a Section 11.31 tax break applicant stored natural gas liquids in underground salt dome caverns. To retrieve the natural gas liquids from the caverns, the applicant would pump brine into the caverns, which would displace the natural gas. The brine was kept in large surface ponds. The applicant sought a 100 percent positive use determination for the ponds

and related equipment, arguing that the brine ponds allowed the company to re-use brine rather than disposing of it in injection wells and then using fresh water to create new brine. 382 S.W.3d at 480. On appeal, the applicant conceded that "its brine-pond system is part of the process by which it produces its gas-storage services for customers," but the applicant nevertheless urged a 100 percent use determination. *Id.* at 488. The Third Court disagreed, holding that "property cannot qualify as 100% pollution-control property if any portion of its value is attributable to its capacity to produce goods and services." *Id*. at 489.

Here, Brazos Electric proposed an application of the CAP formula that resulted in a 100 percent positive use determination, despite the fact that it has conceded that the HRSG serves a production purpose—it produces steam that is in turn used to power a steam turbine. A 100 percent positive use determination would be prohibited in this situation under *Mont Belvieu Caverns*. As such, TCEQ did not act arbitrarily or capriciously by rejecting this application of the CAP formula.

*3.*

*TCEQ Could Rationally Reject Brazos Electric's Remaining Two CAP Formulations That Resulted in Partial Use-Determinations, and Instead Select a Boiler as the Capital Cost Old Factor, Resulting in a Negative Use Determination*

We will address Brazos Electric's remaining two CAP formulations together, as they both apply the NPVMP production variable and result in potentially permissible partial use determinations. For these two formulations, TCEQ rejected Brazos Electric's proposed Capital Cost Old variable inputs and instead *sua sponte* elected to apply its own Capital Cost Old variable input.

TCEQ is correct that Brazos Electric bears the burden of establishing the tax break, and that we should focus our attention on the Capital Cost Old inputs that Brazos Electric actually submitted. *See Tex. Student Housing Authority*, 460 S.W.3d at 141. TCEQ urges us to affirm the

52

agency's decision to reject both the spooling device and "$0" as Capital Cost Old variable without regard to whether TCEQ's alternate selection of the boiler as the Capital Cost Old variable was reasonable. While we believe TCEQ's approach is consistent with the burden of proof in tax cases, out of an abundance of caution, we will address the reasonableness of the Capital Cost Old variables selected by both Brazos Electric and TCEQ. In any event, whether we address the proposed variable in isolation or in relation to one another, the result remains the same. TCEQ ultimately had three reasonable options in front of it. Its selection of one reasonable option and its rejection of the two others was not arbitrary or capricious and is not subject to our potential revision.

i.

TCEQ Could Rationally Reject Brazos Electric's Use of the Spooling Device/Piping As An Analogue Technology to HRSGs; Spooling Devices Have No Productive Value

Brazos Electric's first potentially permissible partial use CAP application applied the value of a spooling device as the Capital Cost Old variable, resulting in use determination of +63.76% for the Johnson County facility and +74.52% for the Jack County facility. TCEQ rejected Brazos Electric's use of the spooling device, finding that the spooling device was not equipment comparable to a HRSG, but that a boiler was. Brazos Electric challenges TCEQ's decision that spooling devices and HRSGs are not comparable analogues as being arbitrary and capricious, wholly outside the zone of reasonable disagreement. We cannot say that TCEQ was wholly irrational in rejecting Brazos Electric's use of the spooling device as a comparable analogue device for purposes of the Capital Cost Old factor.

Brazos Electric's rationale for using the spooling device as being comparable equipment is based primarily on the schematic layout of its facilities. In a single-cycle plant without a HRSG,

53

the spooling device vents heat from the natural gas generator into an exhaust tower, where it is released into the atmosphere. A combined-cycle power plant replaces the spooling device with a HRSG, which recaptures the heat and diverts it to power a second (steam) generator. Without a HRSG, Brazos Electric's plants would have be to replumbed with a spooling device to allow the heat to pass through to an exhaust stack to the atmosphere. Because HRSGs and spooling devices both funnel heat away from the natural gas turbine, and because they occupy the same position in the facility schematics, Brazos Electric insists that HRSGs and spooling devices are comparable technologies, and that no reasonable person could find otherwise.

But just because the empty space at Brazos Electric's power plants would be filled with spooling devices instead of HRSGs does not make it reasonable to assume the two pieces of equipment are analogues. A spooling device connects to an exhaust stack and vents heat off as a waste product; it does not convert heat into steam that can then be used to power a generator. By contrast, a HRSG takes wasted heat from a gas engine and uses it to create steam, which is then used to power a steam generator. While HRSGs and spooling devices occupy the same place in a factory schematic, a HRSG serves an additional function that a spooling device does not—it converts wasted heat into more electricity. That is a distinction with a significant difference. The TCEQ recognized as much when it denied the use of a spooling device as a comparable analogue technology for the Capital Cost Old variable.

"Comparable equipment" is undefined in the regulations, which means we must take the word "comparable" in its common usage. Again, under the arbitrary and capricious standard, the question is not whether we, sitting in the Executive Director's chair, would find that the HRSG and the spooling device are comparable. Recognizing the deference we must give to the Executive Director's decision under the principles of administrative law, the real question is whether it would

be reasonable for a person to see a HRSG and a spooling device as *not* being comparable to one another. We can overturn TCEQ's decision only if no reasonable person could reject Brazos Electric's comparison of the HRSG and the spooling device as being sufficiently similar. Here, we uphold the Executive Director's decision to reject the spooling device as the Capital Cost Old variable because a reasonable person could believe that a HRSG and a spooling device do not serve the save function in a power plant, and are thus not comparable to one another. The Executive Director decision was not arbitrary or capricious.

ii.

TCEQ Could Rationally Reject Brazos Electric's Use of $0 as the Capital Cost Old Variable, Even When the NPVMP Variable Was Also Applied to Recapture Productive Value; TCEQ's Finding That a HRSG and a Boiler Serve the Same Function in a Power Plant Was Reasonable

Finally, we deal with the Executive Director's decision to reject a $0 value as the Capital Cost Old variable, even when coupled with a positive NPVMP variable, in favor of the boiler. The Executive Director's rationale for comparing boilers and HRSGs is simple: both create steam that can be used to power a steam engine, rendering their functions similar. On appeal, TCEQ also points out that many combined-cycle power plants use boilers as a back-up redundancy measure to keep the steam engine running in the event the HRSG stops functioning.

We find, based on the record and arguments presented, that the Executive Director's selection of the boiler as the Capital Cost Old variable was not arbitrary or capricious.

Brazos Electric never directly disputes the assertion that a HRSG and the boiler are functionally comparable, but instead, the company makes much of the fact that the value of the Capital Cost Old factor TCEQ has selected is disproportionate as compared to the price of the HRSGs. Brazos Electric complains that the technology is not "comparable" because the old technology is more expensive than the new technology, meaning that it cannot possibly establish

55

eligibility for a tax break. But the flaw that Brazos Electric complains about is actually a key aspect of the CAP formula. The Section 11.31 tax break is limited to those situations in which compliance with environmental regulation would be economically irrational. *Mont Belvieu Caverns*, 382 S.W.3d at 489. The CAP accounts for economic rationality by producing negative values when new technology costs less than older comparable technology, with the rationale being that if new technology is cheaper than old technology, tax incentives are unnecessary because compliance with green regulations is economically rational. To the extent that Brazos Electric is reiterating its no less-than-zero result argument, we disregard it. Nothing in the statute or rules prevents the Executive Director from finding that comparable old technology is actually more expensive than new technology and applying those factors accordingly in the CAP. Nothing in administrative rules prevents the Executive Director from selecting the boiler as the Capital Cost Old factor.

Brazos Electric also argues that it was reasonable for the company to submit a $0 value as the Capital Cost Old variable because the HRSGs' productive value would be recaptured anyway by the NPVMP variable. Barring the fact that this approach would essentially strike out the use of a Capital Cost Old variable completely in contravention to the text of the administrative rule, the question is not whether Brazos Electric's proposed methodology was reasonable. The question is whether the approach the Executive Director employed was wholly unreasonable. We cannot say here that it was. The rule requires the use of a Capital Cost Old factor to account for marginal costs, and the Executive Director explained his reasons why he selected the boiler as an analogue for a HRSG—both produce steam that can be converted into energy.

Our review on appeal does not permit us to consider whether we, sitting in the TCEQ Executive Director's chair, would have chosen a different analogue technology, or even whether

some other even better analogue technology exists. Instead, the narrow question we must answer under the standard of review is whether the Executive Director acted arbitrarily or capriciously in selecting the boiler as a comparable analogue because he viewed the steam-making functions of a HRSG as being similar to the steam-making functions of a boiler. The Executive Director has stated his reasons for making his selection. In light of the stated reasons for selecting the boiler as an analogue, we cannot say the Executive Director acted arbitrarily and capriciously by selecting a technology that had a similar function. His decision fell within the zone of reasonable disagreement.

Brazos Electric strongly insinuates that the Executive Director's stated reasons do not represent his true views but are simply a pretextual veil he hides behind in imposing his own biases against HRSG applicants; in the company's view, the Executive Director's selection of the boiler was actually a cynical move calculated to force a negative use determination after the TCEQ Commissioner's struck down the Executive Director's original findings on appeal. We empathize with the company's frustrations in dealing with this administrative process, particularly given that especially with the Johnson County facility, litigation seems to have dragged on for years. That being said, "[t]he thought processes or motivations of an administrator are irrelevant in the judicial determination whether the agency order is reasonably sustained by appropriate findings and conclusions that have support in the evidence." *Smith*, 872 S.W.2d at 266. We cannot go behind the Executive Director's stated reasons and question his motives in arriving at his decision. "We must judge the validity of the decision according to the basis upon which it purports to rest." *Id*. at 267. We take his decision as-is and decide only if the administrator acted within the scope of his power. The Executive Director acted reasonably within the bounds of his discretionary authority in selecting the boiler as a Capital Cost Old analogue to a HRSG.

Our opinion should not be read as foreclosing the possibility that future HRSG applicants may come up with a better comparable alternative to a boiler, one that would render TCEQ's use of the boiler wholly unreasonable by comparison. Our opinion also does not foreclose future legislative intervention or more nuanced rulemaking from TCEQ to clarify what seems to be an increasingly Kafkaesque corner of environmental law. Instead, we simply state that based on the record presented and the arguments as teed up in the parties' briefs in this specific case, we cannot overturn the Executive Director's decision here.

*5.*
*CAP Formula Application Conclusion*

TCEQ acted within the bounds of its discretion by rejecting Brazos Electric's proposed formulations of the CAP: the first formulation provides a 100 percent use determination when once has not been earned, and the other two formulations failed to use an analogue device that has comparable productive aspects and failed to offset potential return on investment against cost as required by the CAP. TCEQ also acted within the bounds of its discretion by selecting and applying a boiler as a comparable Capital Cost Old factor because both served a steam-making function.

Issue Three is overruled.

**IV.**
**Coda**

It may be that companies like Brazos Electric should be entitled to tax breaks for adopting clean technologies like HRSGs, even if the company does receive an incidental benefit from going green and that tax money would otherwise go to this state's government, education system, and infrastructure. That policy question is beyond our purview. We are tasked solely with deciding how much leeway TCEQ had in administering the tax break set by the Legislature. Based on our

58

read of the statutes, TCEQ had the power to deny the tax break here, even in light of the positive environmental effects HRSGs have, because the free market worked, clean technology made a power plant more productive, and the interests of a corporation and environmentalists aligned, rendering the tax incentive unnecessary. TCEQ acted within the proper bounds of the discretionary authority given to it by the Legislature.

To the extent the law as it exists now may create unforeseen tax consequences or undercut the purpose of the incentives, the fixes to these thorny issues are legislative or administrative, not judicial.

## CONCLUSION

None of the appellate points raised by Brazos Electric constitute reversible error. The judgment of the trial court is affirmed.

September 15, 2017

YVONNE T. RODRIGUEZ, Justice

Before Rodriguez, J., Palafox, J., and Larsen, Senior Judge
Larsen, Senior Judge (Sitting by Assignment)
Palafox, J. (Dissenting)